Nelson NORMAN, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 10 Civ. 5839(ALC)(HBP).

United States District Court, S.D. New York.

Sept. 25, 2012.

Howard David Olinsky, Olinsky & Shurtliff, Syracuse, NY, for Plaintiff.

Susan D. Baird, U.S. Attorney's Office, New York, NY, for Defendant.

### OPINION & ORDER

ANDREW L. CARTER, JR., District Judge.

Plaintiff Nelson Norman brings this action pursuant to Section 205(g) of the Social Security Act ("SSA"), as amended, 42 U.S.C. §§ 405(g), 1383(c)(3), to seek review of a final decision of the Commissioner of Social Security ("defendant") denying his application for Social Security Income ("SSI") benefits. Both plaintiff and the defendant have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF ## 12 and 14.) In his report and recommendation (the "Report"), Magistrate Judge Henry B. Pitman concluded that the plaintiff's motion should be granted and that defendant's motion should be denied, and recommended that the case be remanded for further proceedings. Specifically, Magistrate Judge Pitman recommends that on remand: (1) the Administrative Law Judge ("ALJ") consider whether plaintiff meets the requirements of Listing 1.04A and explain his reasoning for his ultimate determination; (2) the ALJ confirm that all relevant medical records from Dr. Beale have been provided to the SSA and specify the weight ultimately given to Dr. Beale's opinion, consistent with the rules governing a "treating physician"; and (3) the ALJ reassess plaintiff's credibility and clearly set forth the support for his ultimate determination. Defendant was granted an additional thirty days to object and filed timely objections to the Report on April 11, 2012. Defendant objects to the Report on four grounds: (1) Judge Pitman erred in referencing a previous ALJ decision rather than solely the final ALJ decision; (2) the ALJ's evaluation of plaintiff's impairments at step three of the sequential evaluation was supported by substantial evidence; (3) the ALJ's evaluation of Dr. Beak's assessment was correct under the applicable rules; and (4) the ALJ properly assessed plaintiff's credibility.

The court has reviewed the issues de novo and reached the same conclusions as

did Judge Pitman as expressed in his well-reasoned Report. As such, Judge Pitman's Report is adopted in full. I will address defendant's specific objections herein.

## BACKGROUND

The Court assumes familiarity with the background and procedural posture of this case, and incorporates fully the description contained within Magistrate Judge Pitman's thorough and detailed Report.

## DISCUSSION

### I. Standards of Review

#### A. Review of the Magistrate Judge's Report

■ A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motions. *See* 28 U.S.C. § 636(b)(1). Within fourteen days of service of the recommendation, any party may file written objections to the magistrate's report. *Id.* In evaluating the report, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* Where a party submits timely objections to a report and recommendation, the district court reviews de novo the parts of the report and recommendation to which the party objected. *See id.;* Fed.R.Civ.P. 72(b); *see, e.g., Eisenberg v. New England Motor Freight Inc.,* 564 F.Supp.2d 224, 226–27 (S.D.N.Y. 2008). Where no "specific written objection" is made, the district court may adopt those portions "as long as the factual and legal basis supporting the findings and conclusions set forth ... are not clearly erroneous or contrary to law." *Eisenberg,* 564 F.Supp.2d at 226.

### B. Review of the Administrative Law Judge's Decision

■ When a claimant seeks review of a Social Security hearing regarding disability benefits, the Court's function is not to determine de novo whether the claimant is disabled, but rather to determine only "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004); *see also Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) ("[I]t is not our function to determine de novo whether plaintiff is disabled."). The Supreme Court has defined "substantial evidence" as "more than a mere scintilla" of evidence, and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002) (internal quotation marks omitted); *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). Review of the ALJ's application of legal principles is de novo. *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004).

### II. Defendant's Objections

#### A. Consideration of a Non–Final Decision

■ Defendant argues that the Report repeatedly "considers" an ALJ decision issued on December 28, 2005, which was vacated by the Appeals Council, and that such consideration is prohibited by sections 405(g) and (h) of the Social Security Act. "It is well settled" that these provisions of the Social Security Act provide that "judicial review of Social Security benefit determinations is limited to 'final' decisions of the Commissioner made after a hearing, that available administrative procedures must be exhausted and that a

final decision is a prerequisite for subject matter jurisdiction in the District Court." *Mathews v. Chater,* 891 F.Supp. 186, 188 (S.D.N.Y.1995) (citing *Califano v. Sanders,* 430 U.S. 99, 103 n. 3, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).[1]

In this case, three ALJ decisions were issued rejecting the plaintiff's disability claim, including one issued in December 2005. The plaintiff requested review of each decision, and each time the Appeals Council granted review and remanded the case for further consideration. Finally, in a decision dated May 29, 2008, the ALJ rejected the plaintiff's disability claim for a fourth time. This determination became the final decision of the Commissioner on June 10, 2010, upon the Appeals Council's denial of plaintiff's request for review. Shortly thereafter, plaintiff commenced the present action with this Court. It is not disputed that plaintiff exhausted his available administrative procedures or that this Court has subject matter jurisdiction over this case. Rather, defendant argues that Judge Pitman's various references to the December 2005 throughout his Report are "plainly erroneous" because the May 2008 decision is the only final decision. (Objection at 4.)

█ This Court disagrees. The requirements of 42 U.S.C. §§ 405(g) and (h) are prerequisites for subject matter jurisdiction, which plaintiff satisfied once he exhausted his administrative procedures and obtained a final decision after being denied review from the Appeals Council. *See Stoothoff v. Apfel,* No. 98–cv–5724 (JGK), 1999 WL 493356, at *2 (S.D.N.Y. July 12, 1999) (citing *Sanders,* 430 U.S. at

103 n. 3, 97 S.Ct. 980); *see also Ryan v. Bentsen,* 12 F.3d 245, 247 (D.C.Cir.1993) ("The Secretary's 'final decision' is a prerequisite to subject matter jurisdiction in the district court and consists of two components, a presentment requirement and an exhaustion requirement."). Defendant cites no support for the proposition that once the Appeals Council vacates and remands a decision, all that was included in the administrative record ceases to be relevant such that a reviewing court cannot refer to parts of prior ALJ decisions. Arguing that a district judge cannot "review" a non-final decision for jurisdictional purposes is quite different than arguing that a judge cannot reference relevant facts contained within a prior, albeit vacated, ALJ decision. While the former is plainly erroneous, the latter is what the Magistrate Judge did here. Accordingly, this objection is overruled.

**1. Listing Requirement**

█ Defendant next argues that Judge Pitman erred in requiring the ALJ to explain his reasoning for concluding that the plaintiff did not have an impairment that meets any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the ALJ's decision was nonetheless supported by substantial evidence. *See Berry v. Schweiker,* 675 F.2d 464, 468 (2d Cir.1982) (affirming ALJ's determination at step three even though it did not contain an express rationale, "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence"); *see also Sava v. Astrue,* No. 06–(GAY), 2010 WL 3219311, at *4

---

1. Section 405(g) provides, in relevant part: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action." 42 U.S.C. § 405(g). Section 405(h), in relevant part, provides: "No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided." *Id.* § 405(h).

(S.D.N.Y. Aug. 12, 2010) (affirming determination of ALJ that step three was not met even though the ALJ did not give an express rationale where there was "sufficient uncontradicted evidence in the record to provide substantial evidence for [that] conclusion"). In *Berry*, the Second Circuit was careful to circumscribe the precedent it was setting:

> [I]n spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence. Cases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ. In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision. [citations omitted] *Thus, in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1. the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment.*

*Id.* at 469 (emphasis added). Here, it is unclear from the ALJ's decision which criteria of Listing 1.04A, which is the relevant listing for spinal disorders, the plaintiff failed to meet—or, for that matter, whether the ALJ even applied Listing 1.04A to the plaintiff's impairments.[2] By contrast, in *Berry*, for example, the court was able to "reasonably infer" the particular criteria the ALJ found lacking. *See Berry*, 675 F.2d at 468–69. The Court

agrees with those portions of Judge Pitman's opinion detailing that the medical evidence in the record demonstrates that plaintiff's impairments do in fact meet each of the requirements of Listing 1.04A-even if some of the evidence, particularly with respect to the criteria of muscle weakness, was not overwhelming. (Report at 91–98.) In light of the ALJ's failure to explain his reasoning and the conflicting medical evidence in the record, this Court cannot conclude by looking at "sufficient uncontradicted evidence" that the ALJ's decision was supported by substantial evidence. *See Sava*, 2010 WL 3219311, at *4. Accordingly, this objection is overruled, and the Report's recommendation on this point is adopted.

### 2. Treating Physician Rule

Defendant also objects to Judge Pitman's recommendation that on remand the ALJ should confirm that all relevant medical records from Dr. Beale have been provided to the SSA and that the ALJ should specify the weight ultimately given to Dr. Beale's opinions. Defendant argues that re-contacting Dr. Beale is unnecessary and not required under the rules and regulations because the medical evidence of record was otherwise adequately developed for the ALJ to make his determination. Defendant also contends that the ALJ properly declined to assign Dr. Beale's medical source statement significant weight.

■ As an initial matter, defendant does not object to (and the Court finds no error with) Judge Pitman's determination that Dr. Beale is properly considered to be plaintiff's "treating physician." The opin-

---

**2.** In order to meet the requirements of Listing 1.04A, the plaintiff must demonstrate each of the following spinal disorder criteria; (1) "[e]vidence of nerve root compression; " (2) "neuro-anatomic distribution of pain; " (3) "limitation of motion of the spine; " (4) motor loss (atrophy with associated muscle weakness or muscle weakness); " and (5) sensory or reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

ion of a treating physician must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If a treating source's opinion is not given controlling weight, the SSA must assess the following factors in determining how much weight to afford that opinion: (1) the frequency of examination and the length of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *See Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998) (citing 20 C.F.R. § 416.927(d)(2)). "The Commissioner must set forth 'good reasons' for failing to accord the opinions of a treating physician controlling weight." *Pierre v. Astrue,* No. 09–cv–1864 (JG), 2010 WL 92921, at *8 (E.D.N.Y. Jan. 6, 2010); 20 C.F.R. § 416.927(d)(2). The Second Circuit has instructed that remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion," and when "opinions from ALJs ... do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *See Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2004).

■ Here, the ALJ gave the medical opinion of Dr. Beale, plaintiff's treating physician, less than controlling weight but did not apply the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6). As noted by Judge Pitman, the ALJ discounted Dr. Beale's opinion by stating that it could not "be afforded great weight," but the ALJ did not explain why Dr. Beale's opinion was not afforded great weight. The failure of the ALJ to provide "good reason" for not giving Dr. Beale's opinions control-

ling weight, to mention the weight his opinions were given, and to apply the factors set forth in the regulations are sufficient grounds for remand. *See Halloran,* 362 F.3d at 33; *see also Pierre,* 2010 WL 92921, at *9 (concluding that the ALJ did not provide good reasons for not giving treating physicians' opinions controlling weight and "failed even to mention the weight these opinions were given (except to say it was not 'great')").

■ In addition, "an ALJ cannot reject a treating [source]'s diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999). The Social Security regulations require the ALJ to "seek additional evidence or clarification from [claimant's] medical source when the report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Calzada v. Asture,* 753 F.Supp.2d 250, 277 (S.D.N.Y.2010) (quoting regulation formerly codified at 20 C.F.R. § 404.1512(e)(1)); see also *Clark v. Comm'r of Social Security,* 143 F.3d 115, 117–18 (2d Cir.1998).

Here, the treatment records do not contain Dr. Beale's notes or findings from examinations purportedly conducted between November 2002 (when Dr. Beale stated that he had first examined plaintiff) through November 2005 (when Dr. Beale completed the questionnaire indicating that he examined plaintiff about every six months). Contrary to defendant's assertion, the ALJ cannot conclude that the record was adequately developed without first confirming that no such treatment records exist. Accordingly, these objections are overruled, and the Report's recommendation on this point is adopted.

### 3. Plaintiff's Credibility

Finally, defendant objects to Judge Pitman's finding that the ALJ failed to properly assess plaintiff's credibility. Defendant contends that the ALJ acknowledged plaintiff's symptoms and alleged limitations, carefully assessed the medical evidence, and concluded that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Defendant also argues that the ALJ's credibility assessment was supported by substantial evidence.

 While an ALJ has the discretion not "to credit [claimant's] testimony about the severity of [his] pain and the functional limitations it caused," *Rivers v. Astrue*. 280 Fed.Appx. 20, 22 (2d Cir.2008), the assessment must be made "in light of medical findings and other evidence." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir.1984). However, "[e]ven if subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability. If the claimant's testimony as to pain is not fully supported by clinical evidence, the ALJ must consider additional factors in his assessment." *Urena–Perez v. Astrue*, 06 CIV. 2589 JGK/ MHD, 2009 WL 1726217 (S.D.N.Y. Jan. 6, 2009) *report and recommendation adopted as modified*, 06 CIV. 2589(JGK), 2009 WL 1726212 (S.D.N.Y. June 18, 2009). These factors include: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications taken; and (6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi); 416.929(c)(3)(i)-(vi): *see also Ortiz v. Astrue*, 875 F.Supp.2d 251 (S.D.N.Y.2012). "This issue

is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of [his] ... back pain are consistent with the objective medical and other evidence." *Urena–Perez*, 2009 WL 1726217, at *40 (quoting *Schultz v. Astrue*, 2008 WL 728925, at *12 (N.D.N.Y. March 18, 2008)). "If, after considering plaintiff's subjective testimony, the objective medical evidence and any other factors deemed relevant, the ALJ rejects [his] subjective testimony, he must explain that decision explicitly and with sufficient specificity that a reviewing court may be able to decide whether there are legitimate reasons for the AJL's disbelief and whether his decision is supported by substantial evidence." *Id.* (citing *Schultz*, 2008 WL 728925, at * 12). "Absent these findings, remand is appropriate." *Id.* (citing *Hardhardt v. Astrue*, 2008 WL 2244995, at *10–11 (E.D.N.Y. May 29, 2008)); *see also Fox v. Astrue*, 2008 WL 828078, at *14 (N.D.N.Y. March 26, 2008) (remanding, in part, because the ALJ failed to discuss many of the factors).

 In this case, the ALJ stated that the claimant's allegations of his functional limitations were not credible principally because the ALJ found that the claimant "has been capable of performing light work since his alleged onset date." The ALJ also concluded that "the claimant's statements are not credible to the extent they are inconsistent with the residual functional capacity assessment." This Court concludes that the ALJ committed legal error in evaluating the claimant's credibility. First, the ALJ did not consider the additional factors required by 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) before rejecting plaintiff's subjective testimony, nor did he explain his "decision explicitly and with sufficient specificity that a reviewing

court may be able to decide whether there are legitimate reasons for the AJL's disbelief and whether his decision is supported by substantial evidence." *See Urena–Perez*, 2009 WL 1726217, at *40. Although the ALJ discussed how the medical evidence in the record is inconsistent with an inability to perform light work, the ALJ did not properly question whether the *"plaintiff's statements* about the intensity, persistence, or functionally limiting effects" of his pain are consistent with the objective medical evidence. *See id.* (emphasis added). The recitation of medical evidence, without more, is not a stand-in for a "meaningful analysis of how those factors detracted from [the plaintiff's] credibility." *See Kerr v. Astrue*, No. 09–cv–1119 (GLS), 2010 WL 3907121, at *4 (N.D.N.Y. Sept. 7, 2010) *report and recommendation adopted*, 7:09–CV1119 GLS/VEB, 2010 WL 3893922 (N.D.N.Y. Sept. 30, 2010).

Furthermore, as noted in Judge Pitman's opinion, the ALJ's credibility assessment was improperly performed to the extent that the ALJ first determined plaintiff's overall RFC and then used that RFC to discount plaintiff's non-conforming allegations and resulting limitations. What is missing from such an analysis is "any explanation as to why [p]laintiff's subjective complaints were found less than fully credible." *Id.; see also Meadors v. Astrue*, 370 Fed.Appx. 179, 184 (2d Cir.2010) ("Because we agree that the ALJ did not properly evaluate the Appellant's testimony regarding her pain, we are unable to give his calculation of Appellant's RFC meaningful review."). Accordingly, defendant's objections are overruled, and the Report's recommendation is adopted on this point.

**CONCLUSION**

For the reasons discussed above, judgment on the pleadings is granted in favor of plaintiff and the case is remanded for further proceedings consistent with Judge Pitman's report and recommendation.

SO ORDERED.

*REPORT AND RECOMMENDATION*

HENRY PITMAN, United States Magistrate Judge.

TO THE HONORABLE ANDREW L. CARTER, United States District Judge,

I. *Introduction*

Plaintiff, Nelson Norman, brings this action pursuant to Section 205(g) of the Social Security Act ("SSA"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Both plaintiff and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 12 and 14). For the reasons set forth below, I respectfully recommend that judgment on the pleadings be granted in favor of plaintiff and the case be remanded for further proceedings consistent with this report and recommendation.

II. *Facts*

A. *Procedural Background*

Plaintiff filed an application for disability insurance benefits on October 25, 2000 alleging that he had been disabled since September 20, 2000 [1] due to blindness in

---

1. There is a discrepancy in the administrative record as to the date on which plaintiff claimed his disability began. In his application for disability insurance benefits, the date

is listed as September 20, 2000 (*see* Tr. 276). In his initial disability report, plaintiff listed the date he became unable to work because of his condition as May 3, 2000, and he listed

his right eye (Tr.[2] 55, 100, 178, 276, 307). The SSA initially denied plaintiff's application for benefits on December 15, 2000 (Tr. 48, 68–71). Specifically, the SSA found that plaintiff's "poor eyesight" was not severe enough to keep him from working (Tr. 71). Plaintiff requested reconsideration of the SSA's initial determination, which was denied on February 20, 2001 (Tr. 50, 73–75). In plaintiff's reconsideration request, he additionally alleged that he had been disabled due to "inflamed tissue in [his] right shoulder" (Tr. 321). In an undated Claimant Development questionnaire, plaintiff also listed a left shoulder injury and a lower back condition (Tr. 328).

Plaintiff timely requested (Tr. 76) and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 81–84). ALJ Dennis G. Katz conducted a hearing on December 12, 2001; plaintiff appeared *pro se* (Tr. 636–59). In a decision dated December 17, 2001, the ALJ found that plaintiff had not been under a disability within the meaning of the SSA from September 1, 2000 through the date of the decision (Tr. 100–07).

On December 31, 2001, plaintiff requested review of ALJ Katz's December 17, 2001 decision by the Appeals Council of the SSA Office of Hearings and Appeals ("Appeals Council") (Tr. 113, 115–17). The Appeals Council granted review, and remanded the case for further consideration (Tr. 118–21). Specifically, the Appeals Council directed ALJ Katz to (1) develop the record to clarify the severity of plaintiff's low back and left shoulder impairments, (2) obtain additional evidence concerning plaintiff's orthopedic impairments, (3) re-evaluate plaintiff's subjective complaints in accordance with the applicable SSA rules and regulations, (4) re-evaluate plaintiff's residual functional capacity ("RFC") by conducting a function-by-function assessment of his ability to do work-related physical and mental activities in accordance with the applicable SSA rules and regulations and (5) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base and to determine whether plaintiff has acquired any skills that are transferable to other occupations (Tr. 119–21).

ALJ Katz conducted a second administrative hearing on May 28, 2003; plaintiff was represented by an attorney, Tara Johnson, Esq. Amy Leopold, a vocational expert, also testified at this hearing (Tr. 660–94). In a decision dated June 6, 2003, the ALJ again found that plaintiff had not been under a disability within the meaning of the SSA from September 1, 2000 through the date of the decision (Tr. 178–88).

On June 13, 2003, plaintiff again requested review of ALJ Katz's June 6, 2003 decision by the Appeals Council (Tr. 154, 156–59, 161–62, 189–90). The Appeals Council granted review, and again remanded the case for further consideration (Tr. 191–94). Specifically, the Appeals Council directed the ALJ to (1) obtain all available updated treatment records, including treatment records from Dr. Steven Levine,

---

the date that he actually stopped working as October 2000 (*see* Tr. 307). Finally, in the decisions of Administrative Law Judge ("ALJ") Dennis G. Katz dated December 17, 2001 (*see* Tr. 100) and June 6, 2003 (*see* Tr. 276), the date is listed as September 1, 2000. This discrepancy need not be resolved, however, because plaintiff amended his alleged onset date to June 1, 2001 during his third administrative hearing held on November 25, 2005 before ALJ James B. Reap (*see* Tr. 39, 55, 700–01).

**2.** "Tr." refers to the administrative record that the Commissioner filed as part of its answer, as required by 42 U.S.C. § 405(g).

(2) re-evaluate plaintiff's subjective complaints in accordance with the applicable SSA rules and regulations, (3) if necessary, obtain evidence from an orthopedist medical expert to clarify the nature and severity of plaintiff's orthopedic impairment, (4) re-consider plaintiff's maximum RFC in accordance with the applicable SSA rules and regulations and (5) if warranted, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base (Tr. 192–93).

ALJ James B. Reap conducted the third administrative hearing on November 29, 2005; plaintiff was again represented by an attorney, David Scott, Esq. Donald Slive, a vocational expert, and Ernest Abilees, a medical expert, also testified at this hearing (Tr. 695–733). At this hearing, plaintiff amended his alleged onset date to June 1, 2001 (Tr. 700–01). In a decision dated December 28, 2005, the ALJ again found that plaintiff had not been under a disability within the meaning of the SSA from June 1, 2000 through the date of the decision (Tr. 55–64).

On January 30, 2006, plaintiff requested review of ALJ Reap's decision by the Appeals Council (Tr. 209–10). The Appeals Council granted review, and again remanded the case for further consideration (Tr. 65–67). Specifically, the Appeals Council directed ALJ Reap to (1) re-consider plaintiff's maximum RFC, including non-exertional limitations, for the relevant time period, (2) re-evaluate the medical opinions of plaintiff's treating, examining, and non-examining physicians and explain what weight is given to each opinion and (3) obtain additional evidence from a vocational expert concerning the extent of plaintiff's non-exertional limitations and whether they further diminished the occupational base (Tr. 66).

ALJ Reap conducted the final administrative hearing on May 15, 2008; plaintiff was represented by an attorney, Tamra Jones, Esq. Slive, the vocational expert who testified at the third administrative hearing, also testified at this hearing (Tr. 616–35). In a decision dated May 29, 2008, the ALJ again found that plaintiff had not been under a disability within the meaning of the SSA from June 1, 2000 through the date of the decision (Tr. 39–47). This determination became the final decision of the Commissioner on June 10, 2010, when the Appeals Council denied plaintiff's request for review (Tr. 6–8).

Plaintiff commenced the present action on July 21, 2010. In the complaint, plaintiff alleges that he is disabled due to blindness in his right eye, "fracture pins" in his right wrist, a plastic tendon in his left finger, a "shoulder tear cuff," a severe pinched nerve in his lower back, a fractured left toe, high blood pressure and restless leg syndrome[3] (Complaint, dated July 21, 2010 ("Compl."), (Docket Item 2), ¶ 4). Plaintiff requests that "this Court ... modify the decision of the defendant ... retroactive to the date of the initial disability, or in the alternative, remand to the Commissioner ... for reconsideration of the evidence" (Compl. at VI). The parties now cross-move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 12 and 14).

The Commissioner argues that its decision was supported by substantial evidence and is in accord with applicable law and regulations (Answer, dated December 7, 2010 ("Answer"), (Docket Item 9), ¶ 9; see

---

**3.** Although plaintiff listed "shaken legg [sic] syndrome" in his complaint, he is most likely referring to restless leg syndrome.

*also* Memorandum of Law in Support of the Commissioner's Cross–Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated April 21, 2011 ("Def.'s Mem."), (Docket Item 15), 15–28). Plaintiff argues that (1) the ALJ's failure to consider whether plaintiff met the requirements of Listing 1.04 was erroneous, (2) the ALJ violated the treating physician rule, (3) the ALJ's determination of plaintiff's RFC was erroneous, (4) the ALJ's evaluation of plaintiff's credibility was erroneous and (5) the vocational expert's testimony did not provide substantial evidence to support the ALJ's decision that plaintiff could perform jobs existing in significant numbers in the national economy (Plaintiff's Memorandum of Law, dated March 16, 2011 ("Pl.'s Mem."), (Docket Item 13), 11–24).

### B. *Plaintiff's Social Background*

Plaintiff was born on August 30, 1966 (Tr. 45, 61, 276, 617, 697). At the time of the first administrative hearing, plaintiff was 35 years old, lived by himself and had no children (Tr. 101, 649–50, 654, 701).

Plaintiff completed high school (Tr. 313, 684, 697).

Plaintiff was last employed as a shipping clerk at "EEB Gift," a company located in Mount Vernon, New York (Tr. 308, 343, 362, 369, 374–75, 650–51, 702–03). Plaintiff testified that he had not worked since approximately September 2000[4] (Tr. 640–41; 704). He was employed in the shipping clerk position at EEB Gift for approximately one year, from 1999 through 2000[5] (*see* Tr. 308, 343, 369, 374). The reasons that plaintiff gave for leaving this position included that the season had ended and there was no further work (Tr. 307), that his eye condition interfered with his work (Tr. 315), that he or the company had moved (Tr. 374, 673–74) and that the problems with his left arm interfered with his work (Tr. 704).

Other than his position at EEB Gift, plaintiff's employment included (1) a warehouse clerk position at "Uniko MFG," a company located in New Rochelle, New York, from approximately 1998 through 1999 and (2) a shipping clerk position at "Micro. Bio. Medics," a company located in Pelham Manor, New York, from approximately 1992 through 1997[6] (Tr. 308, 343).

---

4. In plaintiff's disability report dated October 25, 2000, plaintiff stated that he last worked in October 2000 (Tr. 307). This discrepancy, however, does not affect the outcome of the pending motions.

5. In two undated work background reports, one completed by plaintiff in 2004 or some subsequent date and the other completed in late 2007 or some subsequent date, plaintiff stated that he worked at EEB Gift from 1998 through 2000 (*see* Tr. 362, 375).

6. In an undated work background report completed by plaintiff in 2004 or some subsequent date, plaintiff stated that he worked at Uniko MFG from 1997 through 1998 and at Micro. Bio. Med. from 1993 through 1997 (*see* Tr. 362). In a second undated work background report, this one completed by plaintiff in 2005 or some subsequent date, plaintiff stated that he worked at Uniko MFG

from 1997 through 1998 and at Micro. Bio. Med. from 1990 through 1996 (*see* Tr. 369). In two other undated work background reports, one with no indication of when plaintiff completed the form and the other completed by plaintiff in late 2007 or thereafter, plaintiff stated that he worked at Uniko MFG from 1997 through 1998 (*see* Tr. 374–75). Finally, in the undated work background report completed by plaintiff in 2007 or some subsequent date, plaintiff stated that he worked at Micro. Bio. Med. from 1985 through 1997, as well as a shipping clerk at Bally's, a company located in New Rochelle, New York from 1980 through 1982 (*see* Tr. 375). Because plaintiff's last date insured—June 30, 2005 (*see* Tr. 39, 41, 56, 62, 106, 187)—is not disputed by either party, these discrepancies do not affect the outcome of the pending motions.

Plaintiff's primary duties as a shipping clerk consisted of stocking inventory, packing and shipping orders, unloading inventory with a forklift, using computers and other inventory-related duties (Tr. 308, *see also* Tr. 650–51, 702–04). He used machines, tools and equipment, as well as had technical knowledge or skills. Plaintiff also wrote, completed reports and performed similar duties, as well as supervised others (Tr. 308). He frequently lifted objects weighing fifty pounds or more, with the maximum weight lifted being one hundred pounds or more (Tr. 308; *see also* Tr. 702). In a typical workday, which for him consisted of seven hours, plaintiff spent the entire day alternating among walking, standing, sitting, climbing, stooping, kneeling, crouching and crawling. He also spent the entire day handling, grabbing and grasping big objects, as well as writing, typing or handling small objects.

## C. *Plaintiff's Medical Background*

### 1. *Information Reported by Plaintiff*[7]

In his initial disability report dated October 25, 2000, plaintiff reported that his ability to work was limited due to blindness in his right eye because this condition caused his left eye to tear and itch, and further, because his peripheral vision was "off." Plaintiff also stated that his condition caused him pain (Tr. 307).

Plaintiff alleged that his condition began to bother him in 1985, that he became unable to work in May 2000, but that he continued to work until approximately September or October 2000 (Tr. 307, 640–41, 704). Plaintiff stated that when his eye began bothering him, he told his employer that he had to "take it easy" (Tr. 307). However, "the dust, strain, [and] pressure"

of his work was "not good for [his eye]" and plaintiff felt that his bosses were more concerned about plaintiff completing his work than plaintiff's overall health. As a result, plaintiff reported that he was having issues coping with his condition and dealing with others (Tr. 315).

In this report, plaintiff also stated that he first discovered his right eye condition when he was sixteen years old. After noticing that something was amiss, plaintiff underwent an eye examination and was informed that due to an injury that he sustained when he was about eight or nine years old, his retina had become detached (Tr. 314; *see also* Tr. 378). Plaintiff then had a "cataract, retinal detachment" procedure (Tr. 314; *see also* Tr. 654). However, notwithstanding this procedure, plaintiff became legally blind in his right eye (Tr. 314).

In his request for reconsideration of his disability report filed with the SSA on January 20, 2001, plaintiff reported that he had become "upset and stressed out," especially as a result of the SSA's denial of his disability insurance benefits. Plaintiff also reported that he had been advised by all of his physicians to "be careful" and "take it very easy." Plaintiff then reported that, in addition to blindness in his right eye, he was suffering from "inflamed tissue in [his] right shoulder" (Tr. 321). Finally, with respect to his ability to care for his personal needs, plaintiff stated that "due to [his] injury, [he could not] perform the duties as normal people would" (Tr. 323).

In a second request for reconsideration of his disability report filed with the SSA on March 2, 2001 in connection with plain-

---

**7.** Plaintiff testified in detail about his condition and activities of daily living over the course of four administrative hearings conducted before ALJ Katz and ALJ Reap. Testimony from each of the hearings is summarized in the following section, entitled "Proceedings Before the ALJ."

tiff's first request for an administrative hearing, plaintiff reported that he was blind in his right eye and that his daily activities were "limited." Plaintiff again stated that his physicians advised him to be "very careful" and to "take it easy." Plaintiff also reported suffering an injury to his left shoulder in July 2000 (Tr. 331).

With respect to plaintiff's ability to care for his personal needs, he explained that it was "hard for [him] to focus [because] the operation [on his eye had not] been a success," and further, that he experienced "eye aches, pain[,] [and] irritation." Overall, plaintiff described daily life as a "struggle." Plaintiff also stated that he tried not to lift, pull, stretch, or do anything that would cause pain in his shoulder and other parts of his body (Tr. 333). Finally, plaintiff again stated that he was frustrated with the SSA's denial of his disability insurance benefits (Tr. 334).

### 2. Treatment Records

#### a. Suma Medical Services, Inc.

Plaintiff was examined by various physicians of Suma Medical Services, Inc. ("Suma") from approximately March 2001 through June 2001.

On March 16, 2001, plaintiff was first examined by Dr. Ranga Krishna, a neurologist, in connection with a work-related accident that occurred on July 12, 2000 (Tr. 469–72; see also Tr. 562–63). Dr. Krishna noted that plaintiff reported injuring his neck, left shoulder and lower back "while lifting heavy objects at work." Plaintiff also reported that while he had not lost consciousness at the time of the injury, "he [had been] dazed, stunned and confused." Plaintiff then went to Mount Vernon Hospital, but was released shortly after an evaluation. Plaintiff's complaints at the time of Dr. Krishna's examination consisted of intermittent lower back pain, left shoulder pain and neck pain (Tr. 469, see also Tr. 562). After examining plaintiff, Dr. Krishna noted "multiple areas of mild paraspinal tenderness along the lumbar spine especially at the L3–S1 levels on both sides," as well as "paraspinal muscle spasm" and a "restricted range of motion in all planes" (Tr. 470). With respect to plaintiff's cervical spine, Dr. Krishna noted "moderate suboccipital[8] tenderness and multiple areas of tenderness," as well as "paraspinal muscle spasm" and a "restricted range of motion." Overall, plaintiff's range of motion in the lumbosacral[9] spine was 70 degrees and his range of motion in the cervical spine was 60 degrees. Additionally, plaintiff's foraminal compression test[10] was positive, and there was 0–60 degrees straight leg raising bilaterally (Tr. 471). With respect to plaintiff's left shoulder, Dr. Krishna noted "positive tenderness on palpation[11] of the left shoulder joint" (Tr. 470).

**8.** Suboccipital means below the occiput, which in turn, pertains to the posterior part of the head. *Dorland's Illustrated Medical Dictionary*, 1330, 1817 (31st ed.2007) ("*Dorland's*").

**9.** Lumbosacral pertains to the loins and sacrum. *Dorland's* at 1092.

**10.** Foramen refers to "[t]he bony hollow archway created by pedicles of adjacent vertebrae, creating a passageway through which all spinal nerve roots run." *See Spine–Health*, available at http://www.spine-health.com/glossary/f/foramen; *see also Dorland's* at 737.

A foraminal compression test (*i.e.*, a cervical compression test) is a variant of a Spurling's test. "'A positive Spurling's test indicates nerve root compression.'" *Riley v. Astrue*, 06 Civ. 7762(JSR), 2008 WL 2696259 at *6 n. 5 (S.D.N.Y. July 7, 2008) (Rakoff, D.J.), citing *Whitehurst v. Comm'r of Soc. Sec.*, 2008 WL 724164 at *4 n. 4 (S.D.N.Y. Mar. 17, 2008) (Kahn, D.J.) (citing *Taber's Cyclopedic Med. Dictionary* (20th ed.2005), http://www.statref.com).

**11.** Palpation refers to the application of the fingers with light pressure to the surface of the body for the purpose of determining the

Dr. Krishna also made the following findings. Plaintiff's deep tendon reflexes were 2+, *i.e.*, normal, bilaterally. All sensation testing resulted in normal findings. His gait was normal (Tr. 470). Plaintiff's ability for immediate recall was "good" and his long-term memory was "preserved within normal limits." His speech was "fluent," and further, his spoken language comprehension was "intact." Plaintiff's higher cognitive function was also "intact" and "compatible" with his level of education. Plaintiff's visual acuity and hearing acuity were also "normal" (Tr. 471).

On the basis of the foregoing, Dr. Krishna's diagnosis was cervical post-traumatic sprain syndrome, lumbar post-traumatic sprain syndrome, and rule out internal derangement [12] of the left shoulder joint (Tr. 471). Dr. Krishna also opined that plaintiff was "temporarily totally disabled at this time." With respect to treatment of plaintiff's injuries, Dr. Krishna recommended that plaintiff (1) undergo physical therapy sessions four to five times per week, (2) take Naprosyn for pain, (3) refrain from strenuous physical activities, (4) undergo an orthopedic consultation, (5) undergo a pain management consultation and (6) undergo chiropractic treatment of his

cervical spine. Dr. Krishna's prognosis for plaintiff was "guarded." He also opined that plaintiff's work-related injury was "a competent provocative cause of [his] impairment and disability" (Tr. 472).[13]

Plaintiff underwent electromyogram [14] ("EMG") and nerve conduction studies on April 4, 2001 and May 2, 2001 [15] (Tr. 400–01). The April 2001 study revealed left C5–6 radiculopathy [16] (Tr. 400) and the May 2001 study revealed left L5–S1 radiculopathy (Tr. 401). It was recommended that plaintiff (1) refrain from physically strenuous activities, (2) continue current therapy, (3) continue pain medications and (4) undergo a neurological follow-up examination (Tr. 400–01).

On May 24, 2001, Dr. Jatindgr Singh Bakshi, a neurologist, filled out a form entitled "Physician Plan of Treatment and Care" (Tr. 395, 561). On this form, Dr. Bakshi indicated that plaintiff was temporarily unemployable due to blindness in his right eye, left shoulder derangement and lower back syndrome. Dr. Bakshi also noted that plaintiff's treatment plan consisted of physical therapy sessions three times per week, with an expected duration

consistency of the parts beneath in physical diagnosis. *Dorland's* at 1386.

12. Derangement refers to the disarrangement of a part or organ. *Dorland's* at 500.

13. On March 15, 2001, plaintiff was examined by Dr. Corey Stein, a chiropractor, in connection with the July 12, 2000 workrelated accident. The administrative record does not disclose any other information about Dr. Stein. In his report, Dr. Stein stated that plaintiff had injured his left shoulder while engaging in repetitive lifting and that he reported experiencing sharp pain. Dr. Stein's diagnosis was left shoulder sprain/strain, decreased range of motion and left trapezius spasm (Tr. 402). The trapezius muscle extends from the occipital bone to the lower thoracic vertebrae and laterally to the spine of

the scapula. This muscle elevates the shoulder. *Dorland's* at 1231. Scapula pertains to the flat, triangular bone in the back of the shoulder, *i.e.*, the shoulder blade. *Dorland's* at 1698.

14. Electromyogram refers to the record obtained by electromyography, which in turn, refers to an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. *Dorland's* at 609.

15. The results from these studies are handwritten, and, thus, are difficult to read.

16. Radiculopathy refers to a disease of the nerve roots. *Dorland's* at 1595.

of approximately one year. Dr. Bakshi's prognosis was "guarded" (Tr. 395, 561).

On May 25, 2001, Dr. Krishna completed a New York State workers' compensation form for plaintiff (Tr. 397–98). On this form, Dr. Krishna stated that plaintiff had injured himself during work as a result of lifting overloaded boxes. Dr. Krishna also noted that a neurological consultation of plaintiff revealed that he was "temporarily totally disabled" and that he was authorized for physical therapy sessions four times per week. Dr. Krishna listed plaintiff's diagnosis as thoracic [17] or lumbosacral neuritis [18] (Tr. 397–98).

On June 13, 2001, Sadie Patel, a physical therapist, completed a second New York State workers' compensation form for plaintiff (Tr. 399). Patel reported substantially the same information that had been reported on May 25, 2001. The only difference was that Patel listed plaintiff's diagnosis as lumbago,[19] thoracic or lumbosacral neuritis and sprain of an unspecified site of the shoulder (Tr. 399).

### b. *Mount Vernon Neighborhood Health Center* [20]

Plaintiff was examined by physicians at the Mount Vernon Neighborhood Health Center ("Mount Vernon Center") in approximately May 1999, May 2001 and between January 2002 and March 2002 (*see* Tr. 377, 388–90, 480–99).

Plaintiff was first examined by Dr. Michael Borone, an ophthalmologist, on May 3, 1999 (Tr. 377, 388–90). Dr. Boron found that plaintiff was blind in his right eye and that he was at risk for glaucoma [21] in his left eye (*see* Tr. 377, 388–90).

The treatment records show that plaintiff was next examined at Mount Vernon Center by Barry Leavelle, a physician's assistant, on May 24, 2001 (Tr. 495). Leavelle also noted that plaintiff was blind in his right eye and that he had injured his left shoulder and lower back at work in July 2000. In addition, he noted that plaintiff complained of (1) pain radiating to his left biceps and cervical spine and (2) sores on his head. Plaintiff was undergoing physical therapy three times per week (Tr. 495). After examining plaintiff, Leavelle noted "trapezius tenderness" on plaintiff's right side and a decreased range of motion in his left shoulder with pain. Straight leg raising was positive bilaterally with pain. Specifically, plaintiff was limited to 45 degrees on the left side and 30 degrees on the right side. Leavelle's assessment of plaintiff was injury to the left shoulder and lower back, as well as blindness in the right eye. On the basis of the foregoing, Leavelle opined that plaintiff was "temporarily unemployable [for] [six] months [22]" (Tr. 495).

---

**17.** Thoracic pertains to the thorax (chest). *Dorland's* at 1945.

**18.** Neuritis refers to the inflammation of a nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting and disappearance of the reflexes. *Dorland's* at 1282.

**19.** Lumbago refers to pain in the lumbar region. *Dorland's* at 1092.

**20.** The treatment records from Mount Vernon Neighborhood Health Center are handwritten, and, thus, are difficult to read.

**21.** Glaucoma refers to a group of eye diseases, characterized by an increase in intraocular pressure that causes pathologic changes in the optic disk and typical defects in the field of vision. *Dorland's* at 794.

**22.** Because Leavelle's assessment is handwritten, it is difficult to discern whether he opined that plaintiff was temporarily unemployable for six weeks *or* six months. Plaintiff refers to this assessment as six weeks (*see* Pl's. Mem. at 5). However, the handwriting assessment appears to me to say six months (*see* Tr. 495).

Leavelle examined plaintiff again on January 22, 2002 (Tr. 493). At this examination, plaintiff reported (1) left shoulder pain, with no pain radiating to his hand and (2) neck pain and back pain, which he had rated as an 9 out of 10. Plaintiff also described his back pain as a "shooting [and] sharp pain" felt while standing. At the time, plaintiff was taking Naprosyn (Tr. 493). With respect to plaintiff's back, the examination revealed "lumbar tenderness to palpation." Straight leg raising was positive bilaterally with pain. Specifically, plaintiff was limited to 30 degrees on the left side and 20 degrees on the right side. Leavelle's assessment was injury to plaintiff's left shoulder and lumbar spine, as well as blindness in the right eye. On the basis of the foregoing, Leavelle again opined that plaintiff was "temporarily unemployable [for] [six] months [23]" (Tr. 493).

On January 28, 2002, plaintiff was examined by Dr. Sreenivasa Patibandla, an internist (Tr. 494). While the handwritten report from this examination is extremely difficult to read, it appears that part of plaintiff's assessment was "back pain." Additionally, it appears that Dr. Patibandla prescribed some medication for plaintiff to take for his pain (Tr. 494).

Plaintiff was next examined by Dr. Steven Levine, an internist, on February 1, 2002 (Tr. 491; see also Tr. 570). During this examination, Dr. Levine noted that plaintiff complained of (1) lower back pain radiating to his right leg, which he had rated as an 9 out of 10 and (2) left shoulder pain, which he had rated as an 10 out of 10. Plaintiff also stated that he had been experiencing pain in his lower back and in his left shoulder since his work-related injury in July 2000. In addition, Dr. Levine noted that plaintiff underwent an EMG, which revealed a pinched nerve (Tr. 491). After examining plaintiff, Dr. Levine noted that straight leg raising was positive on the right side. Specifically, plaintiff was limited to 45 degrees on the right side only. Plaintiff's deep tendon reflexes were 3/4 in the patella [24] bilaterally and 1/4 in the Achilles tendon bilaterally. On the basis of the foregoing, Dr. Levine's assessment was lumbar radiculopathy and rule out left shoulder rotator cuff injury. Dr. Levine recommended that plaintiff continue taking Naprosyn (Tr. 491).

Dr. Levine examined plaintiff again on February 8, 2002 (Tr. 492; see also Tr. 570). Dr. Levine first noted that while plaintiff had experienced a day or two of relief from pain, his left shoulder pain was presently an 10 out of 10 and his lower back pain was presently an 9 out of 10. After examining plaintiff, Dr. Levine found tenderness to palpation in his left shoulder, as well as a questionable range of motion because plaintiff moved his shoulder "very slowly." Dr. Levine also found tenderness in plaintiff's lower back at L2–S1. Dr. Levine's assessment was lower back pain and left shoulder pain (Tr. 492).

On February 11, 2002, plaintiff was examined by Dr. Bentley Patterson, a dermatologist (Tr. 490). At this time, plaintiff complained of a rash on his scalp that

---

**23.** Again, because Leavelle's assessment is handwritten, it is difficult to discern whether he opined that plaintiff was temporarily unemployable for six weeks *or* six months. The Commissioner refers to this assessment as six months (*see* Def.'s Mem. at 6). Plaintiff makes no mention of Leavelle's January 22, 2002 assessment in his motion papers (*see* Pl's Mem. at 3–11).

**24.** Patella pertains to a triangular sesamoid bone, about 5 cm in diameter, situated at the front of the knee in the tendon of insertion of the quadriceps extensor femoris muscle (also known as the kneecap). *Dorland's* at 1415.

sometimes bled. He stated that the rash developed approximately twice a year. Dr. Patterson's assessment of plaintiff's condition was folliculitis [25] of the scalp and acne keloid. [26] He prescribed antibiotics and topical solutions (Tr. 490).

On February 11, 2002, plaintiff was also examined by Dr. Boron (see Tr. 489, 564). Dr. Boron noted that plaintiff was blind in his right eye, as well as that plaintiff had filed for disability insurance benefits on the basis of a back problem (Tr. 489).

On February 13, 2002, plaintiff underwent an x-ray of his left shoulder (Tr. 491, 498). This x-ray revealed no abnormal findings (Tr. 498).

On February 19, 2002, plaintiff underwent a magnetic resonance imaging ("MRI") scan of his left shoulder and of his lumbar spine (Tr. 438–41, 497). The scan of plaintiff's left shoulder revealed mild subcoracoid [27] bursitis, [28] no rotator cuff tear and a mild impingement on the rotator cuff (Tr. 438–39, 497). The scan of plaintiff's lumbar spine revealed pain and L4–5 left ligamentum [29] flavum hypertrophy with mild postero [30] lateral thecal sac [31] narrowing (Tr. 440).

Plaintiff was last examined by Dr. Levine on February 22, 2002 (Tr. 488). Dr. Levine first noted that plaintiff had returned for further acupuncture treatment. Dr. Levine then noted that plaintiff reported slight relief in his shoulder with this treatment, though the pain had worsened again with lifting. Plaintiff rated the pain in his left shoulder and lower back as an 9 out of 10. Dr. Levine also noted that plaintiff was taking Naprosyn and Vioxx for pain, but that he reported experiencing "little, if any," relief (Tr. 488). After examining plaintiff, Dr. Levine noted tenderness in plaintiff's left shoulder at the bursa, as well as tenderness in his lower back at L3–L4 and L4–L5. Based on the foregoing, Dr. Levine's assessment was lumbar radiculopathy and shoulder pain. He rec-

---

25. Folliculitis refers to the inflammation of a follicle or follicles; usually referring to hair follicles. *Dorland's* at 735.

26. Acne keloid refers to the development of persistent, hard, follicular plaques along the posterior hairline of the scalp that fuse to form a thick, sclerotic, hypertrophic, pseudokeloidal band extending across the occiput. *Dorland's* at 18. Sclerotic means hard, or hardening. *Dorland's* at 1706. Hypertrophic means the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells. *Dorland's* at 910. Keloid means a sharply elevated, irregularly shaped, progressively enlarging scar due to formation of excessive amounts of collagen in the dermis during connective tissue repair. *Dorland's* at 992.

27. Subcoracoid means below the coracoid process. *Dorland's* at 1816. Coracoid process, also referred to as processus coracoideus scapulae, refers to a strong curved process that arises from the upper part of the neck of the scapula and overhangs the shoulder joint. *Dorland's* at 421, 1542.

28. Bursitis refers to the inflammation of a bursa, occasionally accompanied by a calcific deposit in the underlying tendon; the most common site is the subdeltoid bursa. *Dorland's* at 269. Bursa refers to a sac or sac-like cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop. *Dorland's* at 266.

29. Ligamentum pertains to the ligament, which in turn, is a band of tissue that connects bones or supports viscera. *Dorland's* at 1049, 1058. Viscera refers to the viscus, which in turn, pertains to any large interior organ in one of the three great cavities of the body, especially in the abdomen. *Dorland's* at 2094–95.

30. Postero is a combining form that denotes a relationship to the posterior part. *Dorland's* at 1524.

31. Thecal pertains to a theca, which in turn, refers to an enclosing case or sheath, as of a tendon. Sac refers to a pouch or a bag. *Dorland's* at 1685, 1933.

ommended that plaintiff continue taking pain medication (Tr. 488).

Dr. Levine also wrote a letter dated February 22, 2002 concerning plaintiff's treatment (Tr. 435). In this letter, Dr. Levine stated that he had been treating plaintiff for pain in his left shoulder and lower back since February 1, 2002. Dr. Levine then summarized his findings to date and stated that he had referred plaintiff to an orthopedist for a surgical evaluation. It was Dr. Levine's opinion that plaintiff was "currently totally disabled" (Tr. 435).

Plaintiff was examined by Dr. Patterson again on February 22, 2002 and February 25, 2002 (Tr. 486–87). Dr. Patterson's records show that plaintiff continued to suffer from folliculitis and acne keloid. Dr. Patterson also noted that plaintiff was not experiencing pain in his scalp as of February 25, 2002, though mild scabs had formed (Tr. 486–87).

On February 26, 2002, plaintiff underwent an x-ray of his left shoulder. (Tr. 486, 499). This x-ray revealed the following: (1) "left shoulder in several positions including west point, interior rotation and exterior rotation" and (2) "grossly negative study of the left shoulder girdle and osseous [32] structures" (Tr. 499).

On February 28, 2002, plaintiff was again examined by Dr. Boron (Tr. 485, 564). Dr. Boron again found that plaintiff was blind in his right eye, had 20/20 vision in his left eye and was "glaucoma suspect" in his left eye (Tr. 485, 564).

On March 1, 2002, Dr. Michael Palmeri, an orthopedist, conducted an orthopedic consultation of plaintiff (see Tr. 434, 483, 575). Dr. Palmeri noted that plaintiff had sustained injuries to his left shoulder and lower back, and that he was undergoing physical therapy and taking Vioxx for his pain. He also noted that plaintiff stated that the Vioxx did not relieve his pain (Tr. 434, 483, 575). After examining plaintiff, Dr. Palmeri found a decreased range of motion in plaintiff's shoulder, as well as paralumbar tenderness in his lumbar spine. Straight leg raising was negative. Dr. Palmeri's assessment of plaintiff's condition was a shoulder impairment with a probable partial rotator cuff. He recommended physical therapy, as well as possible left shoulder arthoscopy [33] (Tr. 434, 483, 575).

The treatment records show that plaintiff was next examined at Mount Vernon Center on March 7, 2002 (see Tr. 481–82, 573–74). The notes from this date appear to largely confirm the findings discussed above. The treatment records also show that plaintiff failed to appear for his scheduled appointments after this date (see Tr. 480, 484, 571, 576).

Dr. Boron completed a "Vision Impairment Questionnaire" on September 19, 2002 (Tr. 448–55; see also Tr. 480, 571). In this questionnaire, Dr. Boron stated that he had first treated plaintiff on May 3, 1999,[34] that he had last treated plaintiff on February 28, 2002 and that the frequency of treatment was approximately every six months. Dr. Boron's diagnosis/prognosis for plaintiff's right eye was "blind[ness] ... secondary to old retinal detachment" with no improvement expected and his diagnosis/prognosis for plaintiff's left eye

---

32. Osseous refers to the nature or quality of the bone; bony. *Dorland's* at 1364.

33. Arthoscopy refers to an examination of the interior of a joint with an arthoscope. *Dorland's* at 160.

34. It is not clear from this questionnaire, nor from the administrative record, whether any treatment that plaintiff received from Dr. Boron in (or around) May 1999 is related to the present appeal.

was "glaucoma suspect based on optic nerve exam" with a good prognosis (Tr. 448–49). Dr. Boron also noted the following with respect to plaintiff's left eye: (1) 20/20 vision without glasses, (2) full field of vision, (3) normal muscle function and (4) great visual efficiency. Finally, Dr. Boron recommended a follow-up examination because of plaintiff's risk for glaucoma (Tr. 450).

With respect to plaintiff's ability to function, Dr. Boron commented that while plaintiff has "some visual field limitations on the right," he "would be able to perform tasks well that do not demand stereoacuity.[35]" Dr. Boron also stated that plaintiff's pain and other symptoms (1) would "never" be severe enough to interfere with his attention and concentration and (2) would not be likely to produce "good days" and "bad days." Additionally, plaintiff would not need to take unscheduled breaks throughout the workday (Tr. 452). Finally, Dr. Boron opined that plaintiff had no other work-related limitations (Tr. 453).

Dr. Levine wrote a letter to the SSA dated March 22, 2005 (Tr. 570). In this letter, Dr. Levine stated that he was unable to describe plaintiff's then current exertional limitations because he had not examined him in over three years (Tr. 570).

c. *Mount Vernon Hospital.*

Plaintiff was also examined by various physicians at Mount Vernon Hospital. The treatment records indicate that plaintiff was first examined by Dr. Abdullah Mahdi, an internist, on August 18, 2001. This examination revealed normal findings, except for blindness in the right eye (Tr. 393–94).

Plaintiff was next examined by Dr. Karlene Chin, an internist, on July 20, 2002 because of a right wrist injury (*see* Tr. 427–30, 502). Plaintiff sustained this injury as a result of hitting his hand against a pole. Dr. Chin's assessment was intra-articular[36] fracture of the right distal[37] radius.[38] Plaintiff's wrist was tender and swollen (Tr. 427). He also had minimal mobility of his fingers. Additionally, abnormalities in plaintiff's sensory/perception systems and musculoskeletal system were noted (Tr. 428). Plaintiff was instructed to follow up with Dr. John Mitamura, an orthopedist (Tr. 429–30).

Plaintiff was examined by Dr. Mitamura on July 29, 2002 (*see* Tr. 408–26, 504–06). Dr. Mitamura diagnosed plaintiff as suffering from a right wrist fracture of the carpal[39] bone and he recommended that plaintiff undergo an internal fixation procedure (Tr. 408). Dr. Mitamura's report also indicated that (1) plaintiff was currently taking Naprosyn, (2) a review of plaintiff's pertinent systems was nonre-

---

35. Stereoacuity refers to visual acuity with respect to stereoscopic vision, which in turn, means viewing objects with a solid or three-dimensional appearance. *Dorland's* at 1796–97.

36. Intra-articular means within a joint. *Dorland's* at 967.

37. Distal means remote; farther from any point of reference. *Dorland's* at 562.

38. Radius pertains to the bone on the outer or thumb side of the forearm, articulating proximally with the humerus and ulna and distally with the ulna and carpus. *Dorland's* at 1598. Humerus pertains to the bone that extends from the shoulder to the elbow, articulating proximally with the scapula and distally with the radius and ulna. *Dorland's* at 886. Ulna pertains to the inner and larger bone of the forearm, on the side opposite that of the thumb. *Dorland's* at 2026. Carpus pertains to the wrist. *Dorland's* at 302.

39. Carpal pertains to the carpus, or the wrist. *Dorland's* at 302.

markable and (3) plaintiff was experiencing pain in his right lower extremities (Tr. 410–11). Dr. Mitamura's post-operation notes indicate that a "closed reduction wrist fracture procedure and application of [an] external · fixation device" had been performed on plaintiff[40] (Tr. 505–06, *see also* Tr. 417).

The treatment records for September 12, 2002 show that plaintiff was admitted to Mount Vernon Hospital to have the external fixation device removed from his right wrist (Tr. 523–33, 539–57). Dr. Mitamura noted that plaintiff had developed cellulitis[41] in his right wrist, though swelling had diminished "significantly" (Tr. 523, 525–26, 533). Plaintiff also complained of worsening pain. A review of plaintiff's sensory/perception systems and musculoskeletal system again revealed abnormal findings (Tr. 528). However, the severity of plaintiff's pain was perceived to be an 3 out of 10, and plaintiff had a good range of motion in his lower extremities (Tr. 532). Plaintiff's reflexes were 2/4 in his biceps, triceps, plantar, patellar and ankle jerk (Tr. 532). Finally, the treatment records

indicate that plaintiff was taking Naprosyn and Celebrex (Tr. 530).

On September 13, 2002, Dr. Mitamura removed the external fixator device from plaintiff's wrist and performed irrigation and debridement[42] of the external fixator site (Tr. 507–09, 523–25, 534–40, 545–57). Plaintiff's pre- and post-operative diagnoses were "status post-right wrist fracture with external fixator with possible infection" (Tr. 508, 534).

On November 15, 2002, Dr. Jorge Beale, an internist, completed a "Physician's Assessment of Client's Employability" form (Tr. 515). In this form, Dr. Beale noted that plaintiff had (1) lower back pain, which radiated to his right leg because of a pinched nerve, (2) a broken wrist for which he had surgery and (3) ligamentum flavum hypertrophy. Dr. Beale's diagnosis was blindness in the right eye, impingement of the left rotator cuff[43] and lumbar left ligamentum flavum hypertrophy with mild posterolateral thecal sac narrowing. Dr. Beale opined that plaintiff was "permanently unemployable" due to the blindness in his right eye (Tr. 515).[44]

**40.** This procedure consisted of placing various pins in plaintiff's wrist, which were then connected by several bars. The bars were then clamped down in order to hold the fractures in plaintiff's wrist in place while they healed (*see* Tr. 505–06).

**41.** Cellulitis refers to an acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess formation. *Dorland's* at 330. Edematous refers to an edema, which in turn, means the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to the subcutaneous tissues. *Dorland's* at 600–01. Suppurative refers to being characterized by suppuration, which in turn, means the act of being converted into and discharging pus. *Dorland's* at 1832. Subcutaneous means beneath the skin. *Dorland's* at 1816. Finally, an abscess is a local-

ized collection of pus buried in tissues, organs, or confined spaces. *Dorland's* at 5.

**42.** Debridement refers to the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed. *Dorland's* at 481.

**43.** It is unclear from this form whether plaintiff had a rotator cuff tear. In one portion of the form, Dr. Beale stated that plaintiff did have such a tear, but in another portion, he stated that plaintiff did not have such a tear (*see* Tr. 515).

**44.** Though the remainder of the Mount Vernon Hospital records discussed in this section are dated after plaintiff's last insured date on June 30, 2005, I discuss them to the extent that they may be relevant to plaintiff's condition prior to that date.

Dr. Beale also wrote a letter dated September 21, 2005, stating that plaintiff was "under much stress" (Tr. 577). Dr. Beale noted that plaintiff's problems included blindness in his right eye, shoulder pain and lower back pain. Dr. Beale also noted that surgery had been recommended, that plaintiff was taking pain medication and that plaintiff was "presently unable to hold a permanent job" (Tr. 577).

Dr. Beale subsequently completed a "Multiple Impairments Questionnaire" on November 5, 2005 (Tr. 578–85). In this questionnaire, Dr. Beale noted that he had first examined plaintiff on November 15, 2002, that he had last examined plaintiff on November 4, 2005 and that the frequency of treatment was approximately every six months. Dr. Beale's diagnosis was blindness in the right eye, status post broken wrist with slight neuropathy[45] and lower back pain. His prognosis for plaintiff was "guarded" (Tr. 578). He also noted that plaintiff reported pain in (1) his lower back, which radiated to his left lower extremity, (2) his right wrist and (3) his left shoulder (Tr. 579). The pain was intermittent, but constant (Tr. 580). Dr. Beale estimated that plaintiff's pain was an 8 out of 10, and he further estimated that plaintiff's fatigue was an 5 out of 10 (Tr. 580). With respect to medications, Dr. Beale noted that plaintiff was taking Motrin, Lexapro, Doxepin and other medications,[46] as well as was using eye drops (Tr. 582).

With respect to plaintiff's ability to work, Dr. Beale opined that plaintiff could (1) sit for three hours out of an eight-hour workday and (2) stand or walk for one hour out of an eight-hour workday (Tr. 580). Plaintiff could only lift and carry objects weighing up to ten to twenty pounds "occasionally." Overall, plaintiff had "significant limitations" in "repetitive reaching, handling, fingering or lifting" (Tr. 581). Plaintiff also had "moderate" limitations in his right arm and hand with (1) grasping, turning and twisting objects, (2) using his fingers/hands for fine manipulations and (3) using his arms for reaching, including overhead reaching. He had no limitations in his left arm and hand (Tr. 581–82).

Dr. Beale also opined that plaintiff's symptoms were likely to increase if he were placed in a competitive work environment, though his condition was not likely to interfere with his ability to keep his neck in a constant position (Tr. 582). Plaintiff would, however, "frequently" experience pain, fatigue or other symptoms severe enough to interfere with his attention and concentration. Plaintiff would also need to take unscheduled breaks at unpredictable intervals during the workday and he would likely have to rest for approximately fifteen to thirty minutes before returning to work (Tr. 583). Dr. Beale predicted that plaintiff would likely miss more than three workdays a month. Finally, Dr. Beale opined that plaintiff had vision and psychological limitations, both of which would affect his ability to work (Tr. 584).

Thus, while Dr. Beale found plaintiff capable of handling a "low stress" work environment, he opined that plaintiff was unable to do a full-time competitive job requiring activity on a sustained basis. Dr. Beale explained that plaintiff was "very anxious" and had "persistent pain" (Tr. 583).

---

**45.** Neuropathy refers to a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis. *Dorland's* at 1287.

**46.** Because the questionnaire is handwritten, the other listed medications are difficult to read (*see* Tr. 582).

On July 28, 2006, Dr. Beale completed a "Medical Diagnosis/Verification Questionnaire" for the SSA (Tr. 594). In this questionnaire, Dr. Beale stated that plaintiff was suffering from blindness in his right eye, radiculopathy and depression. He further opined that plaintiff was not employable (Tr. 594).

On October 11, 2006, a second questionnaire was completed[47] (Tr. 598–99). In this questionnaire, plaintiff's "disabling factor[s]" were listed as blindness in the right eye and chronic pain. Plaintiff was again described as permanently unemployable (Tr. 598). This questionnaire also noted that plaintiff (1) was receiving treatment on a bi-monthly basis and (2) had been referred to an orthopedic specialist (Tr. 598–99). Finally, plaintiff's medications were listed as Naproxen, APAP/Codeine, Cephalexin, Ibuprofen and Lexapro (Tr. 599).

On November 20, 2006, a third questionnaire was completed[48] (Tr. 606–07). In this questionnaire, plaintiff's medications were listed as Naproxen, Ibuprofen and Lexapro. Plaintiff was undergoing therapy twice a month. Plaintiff continued to be described as not employable (Tr. 606).

With respect to physical functioning, plaintiff was said to be limited in the following activities (limited to one and a half hours, respectively): walking, standing, sitting, lifting, carrying, pushing, pulling, bending, seeing, using his hands, using the stairs and engaging in other climbing activities. With respect to mental functioning, plaintiff was said to be limited in understanding and remembering instruc-

tions, maintaining attention and concentration, making simple decisions and keeping scheduled appointments (Tr. 607).

Lastly, with respect to relevant Mount Vernon Hospital treatment records, the administrative record contains Patient Progress Notes, which span from March 2006 through October 2006 and appear to be signed by Dr. Beale (see Tr. 590–91). These notes appear to confirm the complaints and findings already discussed above—namely that plaintiff (1) continued to complain of pain and (2) experienced decreased strength in his hands, as well as a limited range of motion in his back (Tr. 590). In late July 2006, it was recommended that plaintiff undergo a psychiatric consultation (Tr. 591). As of October 2006, plaintiff's diagnosis was cervical radiculopathy, lumbosacral strain and depression (Tr. 590).

### 3. Medications

Plaintiff reported taking a variety of prescribed medications throughout the relevant time period. Medications for pain relief included: Naprosyn (Naproxen) (see, e.g., Tr. 330, 342, 347, 373, 410, 488, 493, 510, 530, 599, 606), Vioxx (see, e.g., Tr. 434, 483, 488, 575), Celebrex (see, e.g., Tr. 342, 510, 530), Clindamycin (see, e.g., Tr. 342), Cephalexin (see, e.g., Tr. 324, 599), Ibuprofen/Motrin (see, e.g., Tr. 360, 370, 566, 582, 599, 606) and APAP Codeine for pain (see, e.g., Tr. 510, 599). Medications for eye irritation included Alcon (see, e.g., Tr. 370) and Diphenhydramine (see, e.g., Tr. 510). Medications for depression included Lexapro (see, e.g., Tr. 373, 582, 599, 606) and Doxepin (Tr. 582). Finally, plaintiff took Singulair for breathing issues (see, e.g., Tr.

---

**47.** The signature of the preparer of the October 2006 questionnaire is difficult to discern because the questionnaire is entirely handwritten. However, it appears that the questionnaire was completed by an orthopedic specialist at Mount Vernon Hospital (see Tr. 599). In any event, resolution of this question

does not affect the outcome of the pending motions.

**48.** It also appears that the orthopedic specialist referred to in footnote 47 completed the November 2006 questionnaire (see Tr. 606).

360, 370, 566) and Dicloxacillin to treat an abcess (*see, e.g.,* Tr. 370).

### 4. Consultative Physicians

#### a. Dr. Seema Rathi

On December 12, 2000, plaintiff was examined by Dr. Seema Rathi, an ophthalmologist, at the request of the SSA (Tr. 378–79, 403). Dr. Rathi first noted that plaintiff was experiencing pressure in his left eye as a result of the blindness in his right eye. Dr. Rathi also noted that plaintiff had retinal detachment surgery on his right eye when he was younger[49] (Tr. 378). After examining plaintiff, Dr. Rathi found that plaintiff could not read from his right eye and that he had 20/20 vision in his left eye with correction. Dr. Rathi's diagnosis was blindness in the right eye and normal function in the left eye (Tr. 378).

Plaintiff was examined by Dr. Rathi again on October 29, 2002 (Tr. 475–76). In this report, Dr. Rathi noted that plaintiff complained of blindness in his right eye, as well as a broken arm. Additionally, Dr. Rathi noted that plaintiff was being treated for a pinched nerve in his back (Tr. 475). After examining plaintiff, Dr. Rathi's overall assessment was that plaintiff was blind in his right eye and at risk for glaucoma in his left eye. It was recommended that plaintiff wear glasses for his left eye (Tr. 476).

#### b. Dr. Lewis Saperstein

On January 20, 2003, Dr. Lewis Saperstein performed a consultative orthopedic examination of plaintiff (Tr. 510–13). Plaintiff reported that he had injured his lower back two years earlier while lifting objects at work. He described his pain as "sharp." He also stated that the pain radiated to both of his legs, that his right leg felt numb at times and that his pain was exacerbated by lifting and bending. Dr. Saperstein also noted that plaintiff was currently taking APAP # 3, Naproxen, Diphenhydramine and Celebrex (Tr. 510).

Plaintiff also reported suffering from (1) a rotator cuff injury, which he stated needed surgery, (2) a pinched nerve, which he stated affected the pain in his right leg and (3) a fracture in his right wrist, for which he underwent an external fixation device procedure and for which he was still wearing a splint (Tr. 510). With respect to his activities of daily living, plaintiff reported that he engaged in the following activities: cooking, cleaning "slowly," shopping for groceries "slowly" and showering, bathing and dressing "slowly." Plaintiff also reported that he did not do laundry (Tr. 511).

After examining plaintiff, Dr. Saperstein found that plaintiff's station and gait were normal. Plaintiff did not appear to be in acute distress. Further, Dr. Saperstein observed that plaintiff was able to walk on his heels and toes without difficulty and was able to squat fully (Tr. 511). Plaintiff was also able to change for the exam, get on and off the examination table and rise from a chair without assistance. Plaintiff was, however, blind in his right eye and had "20/25 vision" in his right eye. With respect to his hands, plaintiff could not

---

49. Dr. Steven Bodine, an ophthalmologist, stated in a letter dated August 27, 2001 that he operated on plaintiff's right eye in September 1985 (Tr. 391). Specifically, Dr. Bodine stated that (1) plaintiff "had a dense cataract and a retinal detachment in [his] right eye" and (2) to address plaintiff's right eye condition, he had performed a "pars plana lensectomy, vitrectomy, and scleral buckling sur-

gery." Finally, Dr. Bodine reported that he had not examined plaintiff since 1985 (Tr. 391). A vitrectomy is the surgical extraction of the contents of the vitreous chamber of the eye, usually via the pars plana. *Dorland's* at 2098. Sclera pertains to the sclera, which in turn, refers to the tough white outer coat of the eyeball. *Dorland's* at 1704.

make a full fist because of the split; however, range of motion in his fingers was normal and he could touch all of his fingers with his thumb. Grip strength was 4/5 on the right side and 5/5 on the left side (Tr. 511).

With respect to plaintiff's cervical spine, Dr. Saperstein noted full flexion,[50] extension, lateral flexion and rotary movements bilaterally. There was no cervical or para-cervical pain or spasm, nor were there trigger points. With respect to plaintiff's upper extremities, Dr. Saperstein noted a full range of motion in his elbows, fore-arms and left wrist. Plaintiff's right wrist, however, could not be evaluated because of the splint. Plaintiff also had full 5/5 strength in the proximal[51] and distal muscles without muscle atrophy or sensory abnormality (Tr. 511). Plaintiff's reflexes in his upper extremities were not obtainable.

With respect to plaintiff's thoracic and lumbar spines, Dr. Saperstein noted full lateral flexion and full rotary movements bilaterally, though there was "mild lower midline tenderness and paraspinal tenderness" and "sciatic [52] notch tenderness." Straight leg raising was positive bilaterally. Specifically, plaintiff was limited to 45 degrees on both sides. With respect to plaintiff's lower extremities, Dr. Saperstein noted a full range of motion in plaintiff's hips, knees and ankles bilaterally. Plaintiff also had 5/5 strength in the proximal and distal muscles bilaterally, without muscle atrophy or sensory abnormalities.

Plaintiff's reflexes at the ankles were 2+ and equal (Tr. 512).

With respect to plaintiff's left shoulder, Dr. Saperstein noted that his range of motion was 150 degrees on the right side and 110 degrees on forward elevation on the left side. On adduction,[53] plaintiff's range of motion was 150 degrees on the right side and 90 degrees on the left side. Overall, Dr. Saperstein found that plaintiff's adduction, internal rotation and external rotation of the shoulders was normal. Finally, plaintiff had no effusion,[54] inflammation or instability in any of his joints (Tr. 511–12).

Dr. Saperstein diagnosed plaintiff as suffering from (1) rotator cuff tear of the left shoulder, (2) musculoskeletal lumbar pain with radiculopathy to the right, (3) a recent fracture of the right forearm and (4) blindness in his right eye. His prognosis for plaintiff was "fair." Finally, Dr. Saperstein's "Medical Source Statement" indicated that plaintiff would be (1) unable to use his right hand for any activities, (2) "moderately limited from activities requiring the use of his left upper extremity with elevations above the height of the shoulders" and (3) "mildly to moderately limited from activities requiring bending, lifting, or straining at the lower back" (Tr. 512).

c. *Dr. Spencer Colden*

On November 19, 2004, Dr. Spencer Colden performed a consultative orthopedic examination of plaintiff (Tr. 565–68). Plaintiff reported to Dr. Colden that he had injured his left shoulder and lower back at work in 2000. Specifically, plain-

**50.** Flexion refers to the act of bending or condition of being bent. *Dorland's* at 725.

**51.** Proximal means nearest; closer to any point of reference. *Dorland's* at 1562.

**52.** Sciatic pertains to or is located near the sciatic nerve. Dorland's at 1703.

**53.** Adduction refers to the act of adducting or the state of being adducted, which in turn, means to draw toward the median plane or toward the axial line of a limb. *Dorland's* at 27.

**54.** Effusion refers to the escape of fluid into a part or tissue. *Dorland's* at 603.

tiff reported that he had a rotator cuff injury in his left shoulder and a pinched nerve in his lower back—both of which produced a "sharp" and "constant" pain. Plaintiff rated his pain as an 7–9 out of 10, and stated that the pain was exacerbated by lifting and bending. Plaintiff also reported blindness in his right eye and a fracture of his right wrist. With respect to his wrist, plaintiff stated that he still had "a little pain" and that he continued to wear a splint (Tr. 565). With respect to medications, Dr. Colden noted that plaintiff was taking Singulair and Ibuprofen (Tr. 566).

With respect to activities of daily living, plaintiff reported engaging in the following activities: "some" cooking, cleaning, and laundry; showering, bathing, and dressing; listening to the radio and reading the Bible. Plaintiff noted, however, that he did these activities with "difficulty and discomfort." Further, plaintiff reported using a cane for traveling or standing for long periods of time (Tr. 566).

After examining plaintiff, Dr. Colden found that plaintiff's station and gait were normal. Plaintiff did not appear to be in acute distress, though he appeared depressed. With some difficulty, he could walk on his heels and toes. He could squat almost fully, i.e., approximately 75%. Plaintiff was also able to change for the examination, get on and off the examination table and rise from a chair, again, with some difficulty and discomfort. His hand and finger dexterity were intact and he had grip strength of 3 to 4/5 bilaterally. Dr. Colden further noted "reduced effort" throughout the examination possibly due to plaintiff's pain (Tr. 566).

With respect to plaintiff's cervical spine, Dr. Colden noted full flexion, extension, lateral flexion and rotary movements bilat-

erally. There was also no cervical or paracervical pain or spasm, nor were there any trigger points. With respect to plaintiff's upper extremities, Dr. Colden noted a full range of motion in his right shoulder, elbows, forearms and wrists bilaterally. In plaintiff's left shoulder, however, there was forward flexion to approximately 10 degrees and adduction was approximately 20 degrees. Plaintiff had full 5/5 strength in the proximal and distal muscles without muscle atrophy or sensory abnormality. His reflexes were physiologic[55] and equal (Tr. 567).

With respect to plaintiff's thoracic and lumbar spines, Dr. Colden noted flexion to 70 degrees, extension to 20 degrees, lateral flexion to 20 degrees bilaterally and rotation to 20 degrees bilaterally. Dr. Colden also noted "some mild paraspinal muscle tenderness," but no sciatic notch tenderness. In addition, he noted "mild muscle spasm around the quadrants lumborum area." Straight leg raising was positive on the right side only. Specifically, plaintiff was limited to 45 degrees on the right side. With respect to plaintiff's lower extremities, Dr. Colden noted that a full range of motion in plaintiff's hips, knees and ankles bilaterally. He also had 5/5 strength in the proximal and distal muscles without muscle atrophy or sensory abnormality. His reflexes were physiologic and equal. Finally, plaintiff had no effusion, inflammation or instability in any of his joints (Tr. 567).

On the basis of the foregoing, Dr. Colden's diagnosis was (1) blindness in his right eye, (2) a right wrist fracture, status post external fixation with pins, with some pins still in place, (3) left shoulder sprain/rotator cuff injury and (4) lower back sprain. His prognosis for plaintiff was "fair" (Tr. 567). Finally, Dr. Colden's

---

**55.** Physiologic means normal; not pathologic. *Dorland's* at 1464.

"Medical Source Statement" indicated that plaintiff had (1) a "moderate limitation" with repetitive and prolonged fine motor activities with the right hand, (2) a "moderate limitation to left arm movements and activities relating to the left shoulder," *i.e.*, lifting, carrying and overhead activities and (3) a "mild to moderate limitation to activities requiring bending, lifting, and straining at the lower back" (Tr. 567–68).

5. *Other SSA Medical Evidence*

The administrative record also contains a "Physical Residual Functional Capacity Assessment" completed on December 18, 2001 (*see* Tr. 380–87) and a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" dated May 20, 2003 (*see* Tr. 516–19).

The Physical Residual Functional Capacity Assessment, completed by Dr. B.W. Gajwani,[56] contains the following findings with respect to plaintiff's condition as of December 2001. The primary diagnosis for plaintiff was blindness in the right eye, with no secondary diagnosis listed (Tr. 380). Plaintiff had no exertional limitations, postural limitations, manipulative limitations, communicative limitations or any environmental limitations (Tr. 381–82, 384). However, plaintiff did have visual acuity limitations, far acuity limitations and field of vision limitations (Tr. 383).

The Medical Source Statement of Ability to Do Work-Related Activities, completed by an ophthalmologist,[57] contains the following findings. Plaintiff had no limitations with respect to lifting, carrying, standing, walking, sitting, pushing or pulling (Tr. 516–17). With respect to postural limitations, plaintiff could "occasionally" crouch, crawl and stoop, as well as "frequently" balance (Tr. 517). He could never climb or kneel. With respect to manipulative limitations, plaintiff was only limited in reaching in all directions and performing fine manipulations, but he was not limited in performing gross manipulations and feeling. With respect to visual/communicative limitations, plaintiff was only limited in seeing (Tr. 518). Finally, with respect to environmental limitations, plaintiff was only limited by hazards (Tr. 519).

D. *Proceedings Before the ALJ*

Plaintiff's first administrative hearing was conducted before ALJ Katz on December 12, 2001; plaintiff appeared *pro se* at that time (Tr. 636–59). Plaintiff testified to the following facts.

Plaintiff stated that he suffered from blindness in his right eye. He also stated that he was not presently working (Tr. 640). Plaintiff then testified that he self-diagnosed himself with an anxiety condition approximately a week earlier as a result of watching an unidentified television program. With respect to his anxiety condition, plaintiff stated that his mother passed away when he was three years old, that moving from house to house was "distract[ing]" for him and that he often experienced periods of time—approximately twenty minutes or so—where he would just "blank out" while with groups of people (Tr. 641, 652). He also experienced sad feelings and "sweat ferociously" (Tr. 648, 652). Plaintiff described these anxiety attacks as occurring daily (Tr. 653–54).

Plaintiff then testified that he had been suffering from "scalp dermatitis" for the past few years. Specifically, plaintiff stated that if he pressed down on his scalp, it

56. The administrative record does not, nor do the parties' papers in support of their respective motions, disclose Dr. Gajwani's area of specialization.

57. The signature of the ophthalmologist on the report is not legible (*see* Tr. 519).

would bleed. Scabs had also formed (Tr. 642). Plaintiff then explained that he had gone to Mount Vernon Center for treatment and was given a topical gel to use; however, that caused his scalp "break out even more" (Tr. 642–43). Plaintiff also stated that he had been prescribed other medications, but that he had been unable to fill those prescriptions because his insurance coverage had terminated (Tr. 643–44).

Plaintiff next testified that he had a pinched nerve in his left shoulder as a result of a work-related injury that occurred in approximately September 2000, which had also affected his lower back. Plaintiff stated that this injury, in addition to blindness in his right eye, ultimately rendered him unable to work (Tr. 644). Plaintiff explained that even with therapy—which he had attended three times a week for approximately six months—he could only walk for a half hour at a time before needing to sit down. Pain in his left shoulder and back would become too strong and "make [him] stop" (Tr. 645–46). Plaintiff then testified that he was still experiencing pain, but that he did not have the funds, nor health insurance, to pursue further medical treatment (Tr. 646).

With respect to medications, plaintiff testified that he had been taking Anaprox and Naprosyn for his back pain. However, due to lack of funds and insurance coverage, plaintiff stated that he was no longer able to afford his medications (Tr. 648). Plaintiff was also unable to afford his eye glasses (Tr. 650).

With respect to activities of daily living, plaintiff testified that he was thirty-five years old, that he lived by himself and that he did not have any children (Tr. 649, 654). Plaintiff supported himself through welfare benefits, though he stated that it was not enough (Tr. 649–50). Plaintiff explained that he usually took the bus to get around, though he had been driven to the administrative hearing that day by a friend (Tr. 655). Plaintiff listed his activities as shopping, cooking, writing and reading (Tr. 652–53). Plaintiff also stated that he had friends and that he got along with people, though he sometimes experienced anxiety attacks (Tr. 653).

With respect to his past employment, plaintiff testified that he used to do warehouse/shipping work, which involved lifting and driving forklifts (Tr. 650). Specifically, plaintiff would "take orders, type them into the computer, and ship them out, put them on the skids, lift them, and shrink wrap them [as well as use] the forklift." Plaintiff stated that he was akin to "the head of the plant." The ALJ then asked plaintiff whether he had looked for other work, to which plaintiff responded that he had "ideas"—but he needed to take care of his medical problems first (Tr. 651).

Finally, plaintiff testified that he could only work for about 20 minutes at a time before his left arm would "freeze up." He could not lift heavy objects. Specifically, "[t]wenty pounds [would] probably [be] too much" (Tr. 656–57). Plaintiff described his pain, caused by the pinched nerve, as "really bad" (Tr. 655). He also testified that his eye doctor told him that he needed to start "taking it easy" because of the blindness in his right eye (Tr. 656).

Plaintiff's second administrative hearing was also conducted before ALJ Katz on May 28, 2003; plaintiff was represented by an attorney, Tara Johnson, Esq. (Tr. 660–94). At this hearing, plaintiff testified to the following facts.

Plaintiff first stated that he had not worked since the first administrative hearing, which had been held in December 2001 (Tr. 663). Plaintiff then testified that since that hearing, he had two surgeries on his right wrist because he hit his hand on a

pole (Tr. 664–65). Plaintiff stated that he could not do much with his right wrist, and that he was afraid to move it because he was concerned about breaking it again (Tr. 664). Plaintiff was, however, able to pick up the umbrella that he had with him at the hearing that day (Tr. 665). Despite being able to pick up the umbrella, plaintiff explained that he could only hold objects "for so long." Specifically, he had a problem grasping objects (Tr. 666). Plaintiff then testified that he could pick up the hole puncher that was in hearing room, but not the recording machine nor a pitcher full of water (Tr. 666–67).

The ALJ then asked plaintiff about his left shoulder injury (Tr. 667). Plaintiff stated that he was still experiencing pain, and, further, that he could only move his arm for a short period of time before it would "freeze." With respect to performing certain activities, plaintiff testified that he could sign his name on a check, pick up an empty pitcher of water and pour himself a glass of water. Plaintiff could also lift his left arm just short of shoulder length, though he had difficulty with overhead lifting (Tr. 668–69). He also experienced neck pain. Plaintiff further testified that if his pain became more pronounced than it already was, he would consider having left shoulder surgery (Tr. 669).

With respect to his ability to walk and sit, plaintiff testified that his condition in that regard had not changed since the first administrative hearing. He could still walk for about a half hour at a time. He was also "okay" while sitting, but he stated that he had to often "maneuver" or "shift" because of pain (Tr. 670–71, 676). Plaintiff testified that, overall, he felt pain on a daily basis in his neck, shoulder and back.

Moving and doing various things around the house aggravated his pain (Tr. 676–77).

With respect to his visual impairments, plaintiff testified that, in addition to blindness in his right eye and feelings of despair associated with that condition, his left eye had become constantly "itchy" (Tr. 671, 677). He also stated that he was at risk of losing his vision in his left eye (Tr. 671). Plaintiff then testified that he still had sores on his head, which contributed to him feeling "different" (Tr. 678–79).

With respect to activities of daily living, plaintiff testified that he continued to live by himself (Tr. 672). He could write with his left hand, but only for approximately ten minutes before he would start "feeling the pain" (Tr. 675). Plaintiff's attorney then asked him whether his overall condition had gotten better, worse, or remained the same since the first administrative hearing. Plaintiff responded that it had gotten worse. In addition to his other conditions, plaintiff stated that he had trouble sleeping and that he would shake at night "probably" from nerves (Tr. 679–80). He testified that he was still taking Naproxen for pain (Tr. 680). Finally, while plaintiff stated that it was hard dealing with his condition, he had not seen a counselor or mental health professional (Tr. 681).

Amy P. Leopold, a non-physician vocational expert, also testified at plaintiff's second administrative hearing (Tr. 681–93). Leopold began by classifying plaintiff's past relevant work according to skill level and exertional level. She stated that plaintiff's employment (1) as a shipping clerk was at the medium exertional level and that it was "a semi-skilled position" with a specific vocational preparation score [58] ("SPV") of 5 and (2) as a ware-

---

58. "The DOT [i.e., Dictionary of Occupational Titles,] lists a specific vocational preparation (SVP) time for each described occupation.

Using the skill level definitions in 20 [C.F.R.] [§§ ] 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled

house clerk was also at the medium exertional level, but that it was an "unskilled position." Leopold did not specify a SPV score for the warehouse clerk position, though she stated that both positions required a great amount of physical ability—including overhead reaching (Tr. 683–84).

The ALJ asked Leopold what effect blindness in the right eye would have on a person's ability to become employed generally. Leopold responded that as long as the person's vision was clear in his or her other eye, that "should not be a problem at all" (Tr. 684). The ALJ then asked Leopold to consider whether an individual of plaintiff's age, education and past relevant work experience could perform any jobs in the national economy with the following restrictions: (1) blindness in one eye, (2) the inability to reach above shoulder length with his left arm, (3) the inability to use his nondominant arm to perform fine manipulations, except perhaps occasionally and (4) the ability to stand up to six hours in an eight-hour workday. Leopold responded that such an individual would be able to perform several positions (Tr. 685).

First, Leopold stated that such an individual could perform a gate guard position, Dictionary of Occupational Titles ("DOT") § 372.667–030, described as an unskilled position requiring a light level of exertion. Leopold explained that an individual in this position could alternate between sitting and standing throughout the day (Tr. 685). Second, Leopold stated that such an individual could perform a file clerk position, DOT § 206.367–014, described as a position requiring a light level of exertion and a SVP score of 3. Leopold explained that an individual in this position would not have to engage in "reaching over" activities. Third, Leopold stated that such an individual could perform a ticket seller position, DOT § 211.467–036, described as an unskilled position requiring a light level of exertion (Tr. 686). Leopold explained that an individual in this position would also have a sit/stand option [59] (Tr. 687–88).

Plaintiff's attorney then asked Leopold a few questions. First, she asked whether an individual with the aforementioned characteristics and restrictions—but with the added restriction of an inability to climb or to kneel—could perform the same positions just described (Tr. 688). Leopold responded that climbing would not be an issue for any of the positions, but kneeling would be an issue for the file clerk position depending on the degree of the limitation. For example, she noted that a complete inability to kneel would certainly affect an individual's ability to perform the duties of the position (Tr. 689).

Plaintiff's attorney then asked Leopold whether an individual's inability to use his dominant hand repetitively would affect his ability to perform the duties of the positions. Leopold responded that such a restriction would "definitely impact" all three positions (Tr. 689). Finally, plaintiff's attorney asked Leopold whether the gate guard position or the ticket seller position had any lifting or carrying requirements; Leopold responded that they did not (Tr. 690).

Plaintiff's third administrative hearing was conducted before ALJ Reap on November 29, 2005; plaintiff was represented by an attorney, David Scott, Esq. (Tr. 695–733). At this hearing, plaintiff amended

---

work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." SSR 00–4P, 2000 WL 1898704 at *3.

59. Specifically, Leopold stated that while some companies required their ticket-seller employees to stand throughout the workday, more companies were allowing their employees the option of sitting or standing (Tr. 687).

his alleged onset date to June 2001, and testified that he had not worked since that date (Tr. 700–01, 705). Plaintiff then testified to the following facts.

Plaintiff first stated that he was unable to work as a result of (1) two surgeries that he had on his right wrist (2) blindness in his right eye and (3) a pinched nerve in his left shoulder and lower back, which caused radiating pain to his legs (Tr. 698–89). Plaintiff also stated that standing or sitting for a long period of time would cause intermittent pain in his left shoulder, right wrist, back and legs (Tr. 699).

With respect to his past employment, plaintiff testified primarily to the same facts that he had testified to during his first administrative hearing (see Tr. 702–04). Plaintiff added that he lifted and carried objects ranging from zero to eighty pounds (Tr. 702). Plaintiff then testified that he left his job because of the injury to his left arm, and though his doctors had recommended surgery, he was afraid to undergo any procedures (Tr. 697, 704). Plaintiff rated the pain presently in his left shoulder as an 9–10 out of 10. He also stated that when he moved his shoulder, it would "stiffen [ ] up" (Tr. 704–05).

The ALJ then asked plaintiff whether his condition had improved, worsened or stayed the same since his amended alleged onset date. Plaintiff responded that it was worse, but that he had "control"—i.e., that he could "deal" with his situation (Tr. 706). With respect to medications, plaintiff testified that he was taking Ibuprofen and Lexapro, which eased his pain for about six hours at a time (Tr. 707).

With respect to activities of daily living, plaintiff testified that he continued to live alone. He had taken the bus to get to the administrative hearing that day, and he generally walked to his medical appointments (Tr. 701–02). He also testified that while he knew how to drive, he had not

driven in about seven or eight years (Tr. 701). With respect to shopping for groceries and clothing, plaintiff explained that his family would help him, for example, by driving him to the store (Tr. 702). Plaintiff also stated that he had no problems attending to his personal grooming or personal hygiene. He also cooked, did his laundry, read, listened to the radio and cleaned his home (Tr. 707). He did not watch much television (Tr. 707–08). He sometimes took walks, about two to three blocks in distance (Tr. 708). With the exception of these walks, plaintiff stated that he did not get much exercise. He could manage his money. He continued to use a cane for traveling (Tr. 710–11). Finally, plaintiff stated that (1) he had difficulty sleeping through the night (Tr. 711) and (2) he would take one or two naps per day, each one lasting about three to four hours (Tr. 715–16).

With respect to his social life, plaintiff stated that he was "pretty private" and often stayed at home by himself (Tr. 702, 712). At most, he would see family. He attended church sometimes. He was not a member of any organizations or clubs, and he did not have any hobbies (Tr. 709).

The ALJ then asked plaintiff whether he could still lift or carry twenty pounds with his left arm. Plaintiff responded that he could, though not repeatedly (Tr. 712, 717). Plaintiff also stated that he could not carry much, if anything, with his right arm (Tr. 712). Further, plaintiff testified that he had problems standing and sitting such that he could not do either for a full eight-hour workday. Even with breaks, he estimated that he could only stand and sit for about two to three hours at a time. Plaintiff then testified that he could do the following activities: push buttons, pick coins off of a table, write, zip a zipper, tie shoelaces while sitting down, unscrew a cap from a jar depending on how tight it

was and engage in very minimal computer usage (Tr. 712–14).

With respect to medications, plaintiff testified that he was taking Lexapro for depression. He stated that the medication eased his symptoms (Tr. 714). He was not, however, seeing a psychiatrist (Tr. 715).

Dr. Ernest Abilees, a medical expert and retired orthopedist, also testified at plaintiff's third administrative hearing (Tr. 718–27). Dr. Abilees first provided an overview of plaintiff's treatment records to date (see Tr. 720–23). ALJ Reap then asked whether plaintiff's impairments, taken individually or in combination, met or equaled the requirements of the impairment listings. Dr. Abilees responded that they did not (Tr. 723–24).

With respect to functional limitations, Dr. Abilees stated that he did not see any "real evidence" of lower extremity problems. Thus, with the exception of episodic lower back pain, he opined that plaintiff had no limitations on his ability to stand or walk. Dr. Abilees also opined that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds (Tr. 724).

With respect to visual limitations, Dr. Abilees stated that plaintiff could not perform a job that required the use of both eyes (i.e., driving), but that he could perform a job requiring the use of only one eye (Tr. 724–25). Dr. Abilees also opined that plaintiff should avoid jobs involving dangerous machinery. Overall, however, Dr. Abilees found plaintiff's RFC to be for light work (Tr. 725).

Donald Slive, a non-physician vocational expert, also testified at plaintiff's third administrative hearing (Tr. 727–32). Slive began by classifying plaintiff's past relevant work according to skill level and exertional level. He stated that plaintiff's past relevant employment was akin to a materi-al handler position, DOT § 929.687–030, which was a semi-skilled position requiring heavy physical activity. He also stated that plaintiff had non-transferable job skills (Tr. 729).

The ALJ asked Slive to consider whether plaintiff—considering his age, education and past relevant work—could perform his past work with the following restrictions: (1) the ability to perform only light work, with a limited ability to reach overhead with the left arm, (2) a need to avoid heights and climbing, (3) a need to avoid dangerous machinery, (4) a need to avoid driving and (5) blindness in the right eye and overall reduced peripheral vision, but no limits in depth perception or color vision with respect the left eye. Slive responded that plaintiff could not perform his past relevant work, but there was other work that existed in the national economy that he could perform (Tr. 729).

With respect to positions requiring only light work, Slive listed the following: (1) cleaner/housekeeping, DOT § 323.687–014, described as "unskilled" and requiring "a light physical demand" and (2) assembler, small products I and II, DOT §§ 706.684–022, 739.687–030; both described as "unskilled" and requiring "a light physical demand" (Tr. 729–30). With respect to positions requiring only sedentary work, Slive listed the following: (1) document preparer, DOT § 249.587–018, described as "unskilled" and requiring "a sedentary physical demand," (2) surveillance systems monitor, DOT § 379.367–010, described as "unskilled" and requiring "a sedentary physical demand" and (3) charge account clerk, DOT § 205.367–014, described as "unskilled" and requiring "a sedentary physical demand" (Tr. 729–30).

Plaintiff's attorney then asked Slive a few questions. First, he asked Slive whether plaintiff—with the aforementioned characteristics and restrictions, but

with the additional limitation of taking one to two naps per day lasting about three to four hours at a time—could perform the positions requiring light work that he had just described. Slive responded that such an individual would not be able to perform those positions because the workday lasted eight hours (Tr. 731).

Plaintiff's attorney next asked Slive to consider whether an individual who also suffered from attention and concentration deficits about seventy-five percent of the time as a result of his pain, fatigue and other symptoms could perform the positions that he listed requiring light work or sedentary work (Tr. 731–32). Slive responded that such an individual would not be able to perform any of those positions because they each required memory and orientation functioning (Tr. 732). Finally, plaintiff's attorney asked Slive to consider whether an individual who would likely miss work more than three times a month could perform the same positions. Slive responded that such an individual would not be able to perform those positions (Tr. 732).

Plaintiff's final administrative hearing was conducted before ALJ Reap on May 15, 2008; plaintiff was represented by an attorney, Tamra Jones, Esq. (Tr. 616–35). At this hearing, plaintiff testified to the following facts.[60]

Plaintiff first noted that he was still blind in his right eye, and further, that he still had pins in his right wrist from his prior fracture (Tr. 618). He also testified that he continued to experience pain in his left hand, left leg and back (Tr. 619).

Plaintiff then told ALJ Reap about a surgery that he had forgotten to mention at his prior hearings (see Tr. 619–20). Plaintiff stated that he had surgery on his back in 1998 and that the surgery "was the reason why [he] [could] not do like four hours worth of work." Specifically, plaintiff stated that he would "get winded" and experience a "sharp," "crouching pain." The pain was intermittent, but plaintiff described it as "severe." Plaintiff also testified that to ease his pain, he would need to take Naproxen (Tr. 620).

With respect to his left shoulder injury, plaintiff testified that he still needed surgery, but because he had "so many operations[,] [he did not] want to mess with it" (Tr. 620–21). Thus, plaintiff testified that he still experienced "very sharp pain," which he rated as an 9 out of 10. When asked by ALJ Katz what level of pain he was feeling at the hearing, plaintiff responded that the pain was an 8 out of 10 (Tr. 621).

With respect to his right wrist fracture, plaintiff testified that he still experienced a constant and "sharp pain." Plaintiff also stated that he was afraid to do anything with his right hand because he felt like his wrist might "collapse" or "break off" (Tr. 622). Because of this, plaintiff testified that he used his left hand to perform various activities. However, even then, plaintiff stated that he could only reach above his head "slowly" (Tr. 623).

Plaintiff then testified that, overall, the pain in his right wrist and left shoulder had gotten worse (Tr. 623–24). He took Naproxen to ease his pain, but it did not always work (Tr. 624). Additionally, plaintiff stated that he would often run into various things in his apartment (i.e., a

---

**60.** Plaintiff testified to a few injuries—such as cutting a tendon in his middle finger on his left hand (see Tr. 617–18) and injuring his left toe (Tr. 618)—that occurred in the year 2007 and thereafter. The ALJ explained to plain-tiff, however, that because his last insured date was June 30, 2005, unrelated injuries and conditions that occurred subsequent to that date were not relevant (Tr. 618).

wall) because of the blindness in his right eye (Tr. 624–25). With respect to the activities of daily living, plaintiff testified that he did not really have any (Tr. 625).

Slive, the vocational expert from plaintiff's third administrative hearing, also testified at plaintiff's final hearing (Tr. 626–34). Slive began by classifying plaintiff's past relevant work according to skill level and exertional level. He stated that plaintiff's employment, which he characterized as a truck driver position (DOT § 905.663–022) and a laborer/landscape position (DOT § 408.687–014), required physical demand. Specifically, Slive stated that the truck driver position required "a medium physical demand with an SVP [score] [of] 4" and the laborer/landscape position required "a heavy physical demand [with a] SVP [score] [of] 2" (Tr. 667).

The ALJ asked Slive to consider whether plaintiff—considering his age, education and past relevant work—could perform his past work with the following restrictions: (1) blindness in the right eye, with normal vision in the left eye, (2) an inability to perform work requiring fine visual activity, (3) a limited ability to reach overhead on the left side, (4) a need to avoid scaffolds, heights and hazardous machinery and (5) the ability to perform only light work (Tr. 627–28). Slive responded that in addition to the assembler, small products II position identified at plaintiff's third administrative hearing, plaintiff could perform the following: (1) electric sealing with an S machine operator, DOT § 690.685–154, described as a position requiring "a light physical demand" with an SVP score of 2 and (2) an assembler,[61] DOT § 429.684–054, described as a position requiring a "light" level of exertion with a SVP score of 2 (Tr. 628).

The ALJ next asked Slive to consider whether plaintiff could work if he had the limitations listed in the preceding paragraph and was also unable to perform any work other than sedentary work. Slive responded that the base of jobs available would be more limited, but that the document preparer and charge clerk positions identified at plaintiff's third administrative hearing would still available (Tr. 628–29). In addition, he also identified a surveillance system monitor position, DOT § 379.367–410, described as a sedentary position with a SVP score of 2, as being available (Tr. 629).

Finally, the ALJ asked Slive whether there was any conflict between the positions that he identified and the descriptions in the DOT and its companion publication. Slive responded that there were no conflicts (Tr. 629).

Plaintiff's attorney then asked Slive a few questions. First, she asked Slive whether an individual with the aforementioned characteristics and restrictions—but with the additional limitations of (1) only being able to sit for three hours and stand/walk for one hour, (2) attention and concentration deficits such that the individual would be off task for about twenty-five percent of the time and (3) likely absenteeism of greater than three days per month—could perform the positions that he had just listed. Slive responded that such an individual could not perform those positions (Tr. 632–33). Specifically, Slive stated that "if an employee [cannot] maintain time on task at least 90 percent of the time, then that would not be acceptable," and further, "if [the individual's] absences exceed more than three unexcused absences in a month that would not be acceptable …" (Tr. 633).

---

**61.** The full position title was not accurately transcribed, *i.e.*, the hearing transcript on this point states "(INAUDIBLE) assembler" (*see* Tr. 628, 629–30).

Finally, plaintiff's attorney asked Slive whether an individual with the aforementioned characteristics and restrictions—but with the additional limitation of an inability to use the right hand to twist or turn objects or to perform fine manipulations— could perform in the same positions. Slive responded that the lack of "bilateral dexterity" would mean that such an individual could not perform any of the light jobs listed, but that the individual could still perform some of the sedentary positions (Tr. 633–34).

## III. *Analysis*

### A. *Applicable Legal Principles*

#### 1. *Standard of Review*

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir.2008); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000); *Tejada v. Apfel*, 167 F.3d 770, 773–74 (2d Cir.1999); *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir.1998).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Tejada v. Apfel, supra*, 167 F.3d at 773–74; *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987); *Ellington v. Astrue*, 641 F.Supp.2d 322, 327–28 (S.D.N.Y.2009) (Marrero, D.J.). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue, supra*, 641 F.Supp.2d at 328; *accord Johnson v. Bowen, supra*, 817 F.2d at 986. However, "where application of the correct legal principles to the record could lead to only

one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen, supra*, 817 F.2d at 986.

"The Supreme Court has defined substantial evidence as 'more than a mere scintilla' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997), *quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Consequently, where [there is] substantial evidence ... this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon de novo review." *Beres v. Chater*, No. CV–93–5279 (JG), 1996 WL 1088924 at *5 (E.D.N.Y. May 22, 1996); *see also Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984). Thus, "'[t]o determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Terwilliger v. Comm'r of Soc. Sec.*, No. 3:06–CV–0149 (FJS/GHL), 2009 WL 2611267 at *2 (N.D.N.Y. Aug. 24, 2009), *citing Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988).

#### 2. *Determination of Disability*

Under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Walton*, 535 U.S. 212,

217–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

■ The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings, (2) diagnoses or medical opinions of examining physicians, (3) subjective evidence of pain or disability to which the claimant and family or others testify and (4) the claimant's educational background, age and work experience. *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir.1983).

"In evaluating disability claims, the [Commissioner] is required to use a five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920." *Bush v. Shalala,* 94 F.3d 40, 44 (2d Cir.1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where ... the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities .... Where the claimant

does suffer a severe impairment, the third inquiry is whether, based solely on medical evidence, he has an impairment listed in Appendix 1 of the regulations or equal to an impairment listed there .... If a claimant has a listed impairment, the Commissioner considers him disabled. Where a claimant does not have a listed impairment, the fourth inquiry is whether, despite his severe impairment, the claimant has the residual functional capacity to perform his past work .... Finally, where the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *see also Barnhart v. Thomas,* 540 U.S. 20, 24–25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004), *amended on other grounds on rehearing,* 416 F.3d 101 (2d Cir.2005); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Shaw v. Chater, supra,* 221 F.3d at 132; *Brown v. Apfel, supra,* 174 F.3d at 62; *Tejada v. Apfel, supra,* 167 F.3d at 774; *Rivera v. Schweiker, supra,* 717 F.2d at 722.

■ Step four requires that the ALJ make a determination as to the claimant's residual functional capacity. *See Sobolewski v. Apfel,* 985 F.Supp. 300, 309 (E.D.N.Y.1997). RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." *Sobolewski v. Apfel, supra,* 985 F.Supp. at 309. The results of this assessment determine the claimant's ability to perform the exertional demands

of sustained work, and may be categorized as sedentary,[62] light,[63] medium, heavy or very heavy. 20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330(JGK), 1998 WL 150981 at *7 n. 7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

The claimant bears the initial burden of proving disability with respect to the first four steps. Burgess v. Astrue, supra, 537 F.3d at 128; Green–Younger v. Barnhart, supra, 335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step—that the claimant's RFC allows the claimant to perform some work other than the claimant's past work. Balsamo v. Chater, supra, 142 F.3d at 80; Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.1986).

In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

Gray v. Chater, 903 F.Supp. 293, 297–98 (N.D.N.Y.1995) (Koeltl, D.J.). When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work. Butts v. Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid] ).") (internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "limit the range of sedentary work that the claimant can perform." Butts v. Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir.1999) (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603. When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must offer the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383 (internal

---

62. Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday. SSR 96–9p, 1996 WL 374185 at *3 (1996); see 20 C.F.R. §§ 404.1567(a), 416.967(a). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

63. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). Light work often "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

quotation and citation omitted from first quotation); see 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Heckler v. Campbell,* 461 U.S. 458, 462 n. 5, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3. *Treating Physician Rule*

When considering the evidence in the record, the ALJ is required to give deference to the opinions of a claimant's treating physicians. Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in ... [the] record." 20 C.F.R. § 404.1527(d)(2); *Shaw v. Chater, supra,* 221 F.3d at 134; *Diaz v. Shalala,* 59 F.3d 307, 313 n. 6 (2d Cir.1995); *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relation-ship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or con-tradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Schisler v. Sullivan, supra,* 3 F.3d at 567; *Mitchell v. Astrue,* 07 Civ. 285(JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of Freeman, M.J.); *Matovic v. Chater,* 94 Civ. 2296(LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.). "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan, supra,* 3 F.3d at 568; *Burris v. Chater,* 94 Civ. 8049(SHS), 1996 WL 148345 at *6 n. 3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

### 4. *Development of the Record*

"It is the rule in the [Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996), *quoting Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982).

Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982). This duty exists even when the claimant is represented by counsel.... The [Commissioner's] regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d).

*Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996); *see Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) ("We have stated many times that the ALJ generally has an affirmative obligation to develop the ad-ministrative record ....") (internal quotations and citation omitted); *Shaw v. Chater, supra,* 221 F.3d at 131 ("The ALJ has

an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); *Tejada v. Apfel, supra,* 167 F.3d at 774 (same); *Van Dien v. Barnhart,* 04 Civ. 7259(PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same); *Molina v. Barnhart,* 04 Civ. 3201(GEL), 2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, D.J.) (same).

The regulations also state that "[w]hen the evidence we receive from your treating physician ... or other medical source is inadequate for us to determine whether you are disabled, ... [w]e will first recontact your treating physician ... or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e); *see also Perez v. Chater, supra,* 77 F.3d at 47.

██ Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further development is appropriate. *See Pratts v. Chater, supra,* 94 F.3d at 39.

### B. *The ALJ's Decision* [64]

ALJ Reap first noted that plaintiff met the disability insured status requirements through June 30, 2005 (Tr. 41). The ALJ then applied the five-step analysis described above, relying on the medical evidence and plaintiff's testimony to determine that plaintiff was not disabled (Tr. 41–47).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 1, 2001, the alleged onset date of his disability (Tr. 41).

At step two, the ALJ found that plaintiff had the following severe impairments: (1) blindness in the right eye, (2) low back syndrome and (3) left shoulder strain and sprain (Tr. 41).

At step three, the ALJ found that none of plaintiff's physical or mental impairments, either singly or in combination, were severe enough to meet or medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 42). The ALJ did not discuss any particular impairment listings, nor did he explain his reasoning (*see* Tr. 42).

At step four, the ALJ made a determination with respect to plaintiff's RFC, and, further, he determined that plaintiff was unable to perform his past relevant work (Tr. 42–45). The ALJ concluded that plaintiff had the RFC to perform light work, except that he could not perform work requiring visual acuity, overhead reaching with his left arm or hazardous work (Tr. 41). In determining plaintiff's RFC, the ALJ first stated that while he had considered plaintiff's symptoms and allegations, plaintiff's "allegations of his inability to work ... as a result of his functional limitations [were] not credible" (Tr. 42). Specifically, the ALJ noted that plaintiff was "last treated for back and left shoulder impairments on February 22, 2003," that an "MRI [scan] of [his] lumbar spine conducted in February 2005 was unremarkable" and that "MRI testing of the left shoulder showed findings of a mild impingement of the rotator cuff" (Tr. 42).

The ALJ then noted that, in November 2004, Dr. Colden found that plaintiff had only (1) "mild to moderate limitations with respect to bending and lifting as a result of

---

**64.** Because ALJ Reap's decision dated May 15, 2008 is the final decision of the Commissioner, I shall only summarize the findings from that decision in this section of the report and recommendation. I discuss the findings of the other ALJs' decisions in plaintiff's case only to the extent that they are relevant.

his back impairment" and (2) "no limitations with respect to hand activity despite having a slightly weak grip strength" (Tr. 42–43). Overall, the ALJ found this to be "consistent with a conclusion that [plaintiff] possesse[d] the [RFC] to perform light work activity" (Tr. 43).

The ALJ also found that Dr. Krishna's findings were not instructive and that Dr. Levine's findings were not credible. Specifically, Dr. Krishna's reports "were prepared for workers' compensation purposes," and further, they left open the question of whether plaintiff could do any work other than his past relevant work. Additionally, in March 2001, Dr. Krishna found that plaintiff's vision was normal in his left eye.[65] With respect to Dr. Levine, the ALJ stated that while he opined that plaintiff was "totally disabled" in February 2002, "he had only seen [plaintiff] on [two] occasions and ... [MRI] results ... showed only mildly positive findings" (Tr. 43).

The ALJ then stated that Dr. Boron, plaintiff's treating ophthalmologist, "advise[ed] in a February 2002 report that plaintiff [could] work at a regular job on a sustained basis despite his right eye blindness." Additionally, the ALJ noted Dr. Rathi's findings in November 2002 and May 2003 that plaintiff's vision was normal in his left eye[66] (Tr. 43).

The ALJ next noted that x-rays of plaintiff's left shoulder conducted in February 2002 "were negative on both occasions." Further, he stated that Leavelle of Mount Vernon Center found plaintiff to be only "temporarily unemployable for a period of [six] weeks" in May 2001 and again in January 2003[67] (Tr. 43). The ALJ then noted that while EMG studies conducted in March 2002 revealed C5–6 radiculopathy and L5–S1 radiculopathy, "[n]o comment was made [as to] how these findings affected [plaintiff's] ability to function from an exertional standpoint" (Tr. 43–44). Examination in March 2002 also "showed that [plaintiff] had good shoulder range of motion" (Tr. 44).

The ALJ then discussed Dr. Saperstein's findings from January 2003. Specifically, he highlighted that (1) plaintiff was able to perform various activities of daily living and (2) Dr. Saperstein opined that plaintiff was "limited with respect to the use of his right hand and [only had] mild to moderate exertional limitations otherwise." Thus, the ALJ found "Dr. Saperstein's assessment [ ] generally consistent with [plaintiff] being capable of engaging in activities at a light level of exertion without giving consideration to [plaintiff's] right wrist impairment" (Tr. 44).

Next, the ALJ rejected Dr. Beale's November 2002 report, in which Dr. Beale opined that plaintiff was permanently unemployable due to blindness in his right eye. The ALJ reasoned that Dr. Beale's opinion could not be afford "great weight," given that (1) plaintiff "had previously worked despite his visual impairment" and

---

65. The ALJ stated that Dr. Krishna reported no limitation of vision in plaintiff's *right* eye (*see* Tr. 43), but that was likely a typographical error. The administrative record clearly establishes that plaintiff is blind in his right eye, but that he has good vision in his left eye.

66. The ALJ referred to Dr. Rathi as both a "consultative ophthalmologist" and "another treating ophthalmologist" (*see* Tr. 43). This

inconsistency, however, does not affect the outcome of the pending motions.

67. As noted in footnotes 22 and 23, it is not clear from Leavelle's handwritten notes whether he opined that plaintiff was temporarily unemployable for six weeks *or* six months. In any event, this ambiguity does not affect the outcome of the pending motions.

(2) the vocational expert at plaintiff's final administrative hearing testified that "there [were] jobs existing in significant numbers in the national economy despite [plaintiff's] visual impairment." The ALJ also found Dr. Beale's report to be unsupported by the other medical evidence in the record.[68] Lastly, the ALJ noted that Dr. Beale's November 2005 report[69] was "prepared [four] months after [plaintiff's last insured date]" (Tr. 44).

Finally, the ALJ made the following observations. He noted that the clinic notes from July 2006 (stating that plaintiff was limited to standing for three hours and also that he was depressed) could not be afforded great weight, because they were prepared more than a year after his last insured date. The ALJ also rejected Dr. Beale's opinions in 2006 that plaintiff was not employable because "he did not provide the duration of time [that he] was unemployable [for] . . . ." Additionally, the ALJ rejected Dr. Beale's diagnosis of a rotator cuff tear in plaintiff's left shoulder because MRI scans did not support this finding (Tr. 45).

At step five, the ALJ found that there were several jobs that existed in significant numbers in the national economy that plaintiff could perform, given his RFC, age, education and past work experience (Tr. 45–46). He noted that plaintiff was a "younger individual"—being forty-one years of age as of the date of the decision and thirty-nine years of age as of his last insured date—and that he had at least a high school education (Tr. 45). He noted

that plaintiff had acquired transferable work skills from his past relevant work. Based on these vocational factors and plaintiff's RFC to perform light work with a few limitations, the ALJ found that plaintiff was not disabled under 20 C.F.R. Part 404, Subpart P, Appendix 2 (Tr. 45–46).

The ALJ then found that, based on the vocational expert's testimony at plaintiff's final administrative hearing, plaintiff could perform the following light exertional level positions, all of which existed in the national and regional economies: (1) assembler of large types of components for electrical equipment, (2) electric machine operator and (3) small parts II assembler. The ALJ also found that plaintiff could perform the following sedentary level positions, all of which existed in the national and regional economies: (1) document preparer, (2) charge account clerk and (3) surveillance system monitor. Finally, the ALJ noted that the vocational expert stated that his testimony was consistent with the information contained in the DOT and the selected characteristics of the positions (Tr. 46).

## C. Analysis of the ALJ's Decision

As noted above, plaintiff argues that (1) the ALJ's failure to consider whether plaintiff met the requirements of Listing 1.04 was erroneous, (2) the ALJ violated the treating physician rule, (3) the ALJ's determination of plaintiff's RFC was erroneous, (4) the ALJ's evaluation of plaintiff's credibility was erroneous and (5) the

**68.** Specifically, the ALJ found that there was no support for (1) Dr. Beale's finding that plaintiff suffered from a pinched nerve in his back (see Tr. 576) and (2) Dr. Beale's opinion as to plaintiff's specific work-related limitations, i.e., that plaintiff could only sit, stand and walk for up to three hours, that plaintiff could lift and carry objects weighing up to twenty pounds and that plaintiff's anxiety

would cause him to miss more than three days of work a month (see Tr. 580–84).

**69.** The ALJ referred to this report as Dr. Beale's "September 2005 report." This appears to be another typographical error, as the findings referred to by the ALJ in his decision are from Dr. Beale's November 2005 Multiple Impairments Questionnaire.

vocational expert's testimony did not provide substantial evidence to support the ALJ's decision that plaintiff could perform jobs existing in significant numbers in the national economy (*see* Pl.'s Mem. at 11–24).

### 1. *Legal Error*

#### a. *Listing Requirements*

Plaintiff first argues that the ALJ erred when he concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 because (1) the ALJ did not consider Listing 1.04A and (2) the ALJ did not provide any reasoning whatsoever for his conclusion at step three of the analysis [70] (Pl.'s Mem. at 13–16; *see also* Plaintiff's Reply, undated ("Pl.'s Reply"), (Docket Item 17), at 1–4). The Commissioner responds that (1) though the ALJ did not explain his reasoning, he was not required to do so because plaintiff had not carried his burden of demonstrating that his impairments met all of the requirements for Listing 1.04A and (2) in any event, the ALJ's finding was supported by substantial evidence (*see* Def.'s Mem. at 18–19).

■■■ Listing 1.04A, entitled "Disorders of the spine," provides, in relevant part, that:

*Disorders of the spine* (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. It is the plaintiff's burden to "demonstrate that [his] disability [meets] '*all* of the specified medical criteria' of a spinal disorder." *Otts v. Comm'r of Soc. Sec.*, 249 Fed.Appx. 887, 888 (2d Cir.2007), *quoting in part Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original) and *citing Rosa v. Callahan, supra*, 168 F.3d at 77. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." [71] *Sullivan v. Zebley*,

---

**70.** ALJ Reap approached step three of the analysis in exactly the same manner in his decision dated December 28, 2005 following plaintiff's third administrative hearing. Specifically, he stated that while plaintiff had severe impairments—consisting of blindness in the right eye and left shoulder strain/sprain—they were not severe enough to meet or medically equally, either singly or in combination, one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. He did not provide any further discussion about particular Listings or any explanation for his conclusion (*see* Tr. 57).

**71.** However, "[e]ven if a claimant's impairment does not meet the specific criteria of a Medical Listing, it still may equal the List-

ing." *Valet v. Astrue*, 10–CV–3282 (KAM), 2012 WL 194970 at *13 (E.D.N.Y. Jan. 23, 2012). Specifically, "[t]he Commissioner will find that a claimant's impairment is medically equivalent to a Medical Listing if: (1) the claimant has other findings that are related to his or her impairment that are equal in medical severity; (2) the claimant has a 'closely analogous' impairment that is 'of equal medical significance to those of a listed impairment;' or (3) the claimant has a combination of impairments that are medically equivalent." *Valet v. Astrue, supra*, 2012 WL 194970 at *13, *citing* § 404.1526(b)(1)-(3). While plaintiff generally states in his reply papers that the medical evidence raises the issue of whether he "meets or *equals* Listing 1.04" (Pl.'s Reply Mem. at 4) (emphasis add-

*supra*, 493 U.S. at 530, 110 S.Ct. 885 (citation omitted).

There does not appear to be a well-settled requirement that an ALJ provide an explanation for his conclusion at step three of the analysis:

> Courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 52 (W.D.N.Y.2002). However, if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir.1982).

*Rockwood v. Astrue*, 614 F.Supp.2d 252, 273 (N.D.N.Y.2009); *see also Salmini v. Comm'r of Soc. Sec.*, 371 Fed.Appx. 109, 113 (2d Cir.2010) ("Although we have cautioned that an ALJ 'should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment,' the absence of an express rationale ... does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.' "); *Otts v. Comm'r of Soc. Sec.*, *supra*, 249 Fed.Appx. at 889 (same); *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir.1982) (same).

I now turn to the question of whether the medical evidence in the record demonstrates that plaintiff's impairments meet the requirements of Listing 1.04A. It should be noted at the outset that a medical expert testified at plaintiff's third administrative hearing and opined that plaintiff's impairments did not meet any of the relevant Listings (Tr. 723–24). The medical expert did not, however, discuss Listing 1.04A specifically, nor did he explain his reasoning (*see* Tr. 718–27).

The first requirement of Listing 1.04A is "evidence of nerve root compression characterized by neuro-anatomic distribution of pain." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. With respect to neuro-anatomic distribution of pain, the treatment records are replete with plaintiff's complaints over the relevant time period of radiating pain in his neck, shoulder, lower back and legs (*see, e.g.*, Tr. 410–11, 434, 469, 483, 488, 492–95, 510, 515, 528, 562, 566, 575, 578–80). Plaintiff also complained to Dr. Saperstein in November 2003 of right leg numbness that he was experiencing at night (*see* Tr. 510). *Cf. Muntz v. Astrue*, 540 F.Supp.2d 411, 420 (W.D.N.Y.2008) (evidence of neuro-anatomic pain was found where the plaintiff complained to physicians of back pain with radiating numbness and weakness).

With respect to evidence of a nerve root compression, there are the following diagnoses/assessments throughout the treatment records: (1) cervical and lumbar radiculopathy (*see, e.g.*, Tr. 400–01, 435, 488, 491, 512, 590, 594), which refers to a disease of the nerve roots, (2) thoracic or lumbosacral neuritis (*see, e.g.*, Tr. 397–99), which refers to the inflammation of a nerve characterized by pain, tenderness, paralysis, wasting and disappearance of the reflexes, (3) a positive foraminal (i.e., cervical) compression test (*see, e.g.*, Tr. 471), which indicates nerve root compression, (4) L4–5 left ligamentum flavum hy-

---

ed), the substance of his argument in both his initial motion papers and his reply papers only discuss whether his impairments *meet* the requirements of Listing 1.04A (*see* Pl.'s Mem. 13–16; Pl.'s Reply Mem. 1–4).

pertrophy with mild postero lateral thecal sac narrowing of the lumbar spine (*see, e.g.,* Tr. 440, 488, 515, 570), (5) a pinched nerve (*see, e.g.,* Tr. 491, 515) and (6) slight neuropathy, which refers to a functional disturbance or pathological change in the peripheral nervous system (Tr. 578). These complaints of pain and medical findings/diagnoses, which clearly relate to possible nerve root compression, are some evidence of the first requirement of Listing 1.04A.

The second requirement of Listing 1.04A is "limitation of motion of the spine." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. The treatment records again contain references to a limited range of motion in plaintiff's spine and surrounding areas. For example, Dr. Krishna's March 2001 examination revealed (1) tenderness, paraspinal muscle spasm and a restricted range of motion in plaintiff's lumbar and cervical spine (*see* Tr. 470–71) and (2) tenderness in plaintiff's left shoulder (*see* Tr. 470). Dr. Stein's March 2001 examination revealed a decreased range of motion in plaintiff's left shoulder (*see* Tr. 402), as did Leavelle's May 2001 assessment (*see* Tr. 495). Further, from January 2002 through March 2002, plaintiff's examinations at Mount Vernon Center revealed (1) tenderness in plaintiff's lumbar spine, left shoulder and back (*see* Tr. 434, 483, 488, 492–93, 575) and (2) a decreased range of motion in plaintiff's shoulder (*see* Tr. 434, 483, 492, 575). Finally, (1) Dr. Colden's November 2004 examination revealed a decreased range of motion in plaintiff's left shoulder and his thoracic and lumbar spines (*see* Tr. 567) and (2) Patient Progress Notes from October 2006 revealed a decreased range of motion, though it did not specify where (Tr. 590).

While plaintiff was noted to have a good range of motion (1) in his left shoulder by Mount Vernon Center in March 2002 (*see.* Tr. 481–82), (2) in his lower extremities by Mount Vernon Hospital in September 2002 (*see* Tr. 532) and (3) in his lower and upper extremities by Dr. Saperstein in January 2003 (*see* Tr. 511–12), it is not for me to reconcile the conflicting medical evidence in the record—that is the obligation of the ALJ. There is, however, some evidence of the second requirement of Listing 1.04A.

The third requirement of Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. First, with respect to establishing sensory or reflex loss, the treatment records clearly indicate that plaintiff experienced some issues with his reflexes during the relevant time period. For example, part of plaintiff's diagnosis in May 2001 and June 2001 was thoracic or lumbosacral neuritis (*see* Tr. 397–99), which is a condition that refers to the inflammation of a nerve and which can be accompanied by disappearance of the reflexes. In February 2002, Dr. Levine found that plaintiff's deep tendon reflexes were 3/4 in the patella bilaterally and 1/4 in the achilles tendon bilaterally (*see* Tr. 491). Then, in July 2002 and September 2002, the Mount Vernon Hospital records indicated that there were abnormalities in plaintiff's musculoskeletal systems [72] (*see* Tr. 428, 528). The September 2002 Mount Vernon Hospital treatment records also indicated that plaintiff's reflexes were 2/4 in his biceps, triceps, plantar, patellar and ankle jerk (*see* Tr. 532). While there are also findings in the treatment records that indicate

---

72. There is no further elaboration in the Mount Vernon Hospital treatment records as

to the specifics of these abnormalities.

plaintiff's reflexes were normal at various points throughout the relevant time period [73] (*see, e.g.,* Tr. 470, 511–12, 567), that is also a conflict for the ALJ to resolve.

With respect to atrophy associated with muscle weakness or muscle weakness, the medical evidence demonstrates the following. In March 2001, Dr. Krishna noted that plaintiff's gait and his extremities were normal (*see* Tr. 470–71). In January 2003, Dr. Saperstein noted that plaintiff's gait was normal, that he could walk on his heels and toes without difficulty, that he could squat, that he needed no help changing for the examination or getting on and off the table and that he was able to rise from the chair without difficulty. Additionally, strength was 5/5 in the proximal and distal muscles in plaintiff's upper and lower extremities. Neither muscle atrophy nor sensory abnormalities were noted (*see* Tr. 511–12).

However, in November 2004, Dr. Colden noted that plaintiff exhibited "questionable reduced effort throughout the exam possibly due to pain." Additionally, while plaintiff could walk on his heels and toes, change for the exam, get on and off the exam table and rise from a chair—he did so with some difficulty and discomfort. Further, plaintiff could only squat "almost full" to about 75%. With respect to plaintiff's muscle strength, strength was still 5/5 in the proximal and distal muscles in both his upper and lower extremities. Neither muscle atrophy nor sensory abnormalities were noted (*see* Tr. 566–67).

Plaintiff's grip strength was noted to be slightly weak in both (1) Dr. Saperstein's November 2003 examination, *i.e.,* 4/5 in his right hand and (2) Dr. Colden's November 2004 examination, *i.e.,* 3/5 to 4/5 bilaterally (*see* Tr. 566).

The medical evidence noted above does not establish atrophy associated with muscle weakness. The only references to muscle atrophy establish that plaintiff had no such atrophy. With respect to muscle weakness, however, while the medical evidence is not overwhelming—it does indicate that plaintiff may have had some difficulty with walking on his heels or toes and/or squatting. *See* 20 C.F.R. Pt. 404, Subpt. P, App. A, § 1.00(E)(1) (noting that "significant motor loss" may be shown by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position."); *see also Olechna v. Astrue,* No. 08–CV–398, 2010 WL 786256 at *6 (N.D.N.Y. Mar. 3, 2010) (adopting Report and Recommendation) (noting that "[p]laintiff's muscle weakness was also documented in his inability or difficulty with heal and toe walking"). The medical evidence also indicates that plaintiff had a slightly weak grip strength in November 2003 and again in November 2004. *See Kerr v. Astrue,* No. 09–CV–01119 (GLS), 2010 WL 3907121 at *6 (N.D.N.Y. Sept. 7, 2010) (Report and Recommendation) (noting that "varying degrees of hand grip or grasp weakness" was some evidence that plaintiff had experienced muscle weakness), *adopted at* 2010 WL 3893922 (N.D.N.Y. Sept. 30, 2010). Finally, Dr. Colden also noted that plaintiff was exhibiting "questionable reduced effort throughout the exam possibly due to pain" (*see* Tr. 566). Thus, on the basis of the foregoing, the medical evidence noted above is some

---

**73.** For example, Dr. Krishna found that plaintiff's deep tendon reflexes were 2+ and normal bilaterally in March 2001 (*see* Tr. 470). Dr. Saperstein's November 2003 examination also noted that plaintiff's reflexes were 2+ and equal in his lower extremities, though his reflexes in his upper extremities could not be obtained (*see* Tr. 511–12). Finally, Dr. Colden's November 2004 examination noted that plaintiff's reflexes were physiologic and equal in both his upper and lower extremities (*see* Tr. 567).

evidence of the third requirement of Listing 1.04A.

The final requirement of Listing 1.04A is "positive straight-leg raising test (sitting and supine)." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. There is evidence to support this requirement as well, because the treatment records indicate that plaintiff had numerous positive straight leg raising tests over the years. For example, straight leg raising tests were positive in the following months: March 2001 (*see* Tr. 471), May 2001 (*see* Tr. 493, 495), February 2002 (*see* Tr. 491), January 2003 (*see* Tr. 512) and November 2004 (*see* Tr. 567).

█ Although it may be the case that the ALJ would ultimately have decided that plaintiff's impairments did not meet or equal the requirements of Listing 1.04A, this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet any of the listings. *See Kerr v. Astrue, supra*, 2010 WL 3907121 at *6 (noting that "given the above cited evidence, [p]laintiff was owed a more substantive discussion of why she did not meet Listing 1.04A"), *adopted at* 2010 WL 3893922; *see also Blais v. Astrue*, No. 08–CV–01223 (DNH), 2010 WL 2400177 at *5 (N.D.N.Y. May 13, 2010) (Report and Recommendation) (same), *adopted at* 2010 WL 2400174 (N.D.N.Y. June 10, 2010). As a result of the medical evidence discussed above, and in conjunction with the ALJ's failure to address the potential applicability of Listing 1.04A, I cannot conclude that there is "sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet step three." *See Sava v. Astrue, supra*, 2010 WL 3219311 at *4. On remand, the ALJ should consider whether plaintiff meets the requirements of Listing 1.04A and he should explain his reasoning for his ultimate determination.

### b. *Treating Physician Rule*

Plaintiff also argues that the ALJ failed to give controlling weight to the opinions of Dr. Beale, one of plaintiff's treating physicians, when his opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [were] consistent with other substantial evidence in the record" (Pl.'s Mem. at 19). Specifically, plaintiff contends that (1) the ALJ "did not properly evaluate the specific functional limitations provided by Dr. Beale" in his November 2002 and November 2005 reports, which plaintiff described as limitations of "less than sedentary and light work" (Pl.'s Mem. at 19–20) (internal footnotes omitted) and (2) the ALJ did not apply the "evaluative factors" set forth in 20 C.F.R. § 404.1527 in determining what weight to give to Dr. Beale's opinions (Pl.'s Mem. at 21). The Commissioner contends that (1) Dr. Beale is not properly considered plaintiff's treating physician (Def.'s Mem. at 22) and (2) in any event, Dr. Beale's opinions were not entitled to controlling weight because they were contradicted by other evidence in the record (Def.'s Mem. at 23).

█ I first consider whether Dr. Beale can properly be considered plaintiff's treating physician. A physician who has examined a claimant on one or two occasions is generally not considered a treating physician. *See* 20 C.F.R. § 404.1502 ("We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (*e.g.*, twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)."); *see also Shatraw v. Astrue*, No. 7:04–CV–0510 (NAM/RFT), 2008 WL

4517811 at *10 (N.D.N.Y. Sept. 30, 2008) ("Doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians."), *citing Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) *and Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir.1988); *accord Garcia v. Barnhart,* 01 Civ. 8300(GEL), 2003 WL 68040 at *5 n. 4 (S.D.N.Y. Jan. 7, 2003) (Lynch, then D.J., now Cir. J.).

■ In plaintiff's case, Dr. Beale completed a Multiple Impairments Questionnaire in November 2005 stating that he first examined plaintiff in November 2002 and that he examined plaintiff thereafter about every six months (Tr. 578). Plaintiff testified that he saw Dr. Beale more frequently, about every three months (*see* Tr. 698). Additionally, when plaintiff updated the SSA with respect to recent medical treatment that he had received and recent medications that he had been prescribed, plaintiff often listed Dr. Beale as his physician (*see, e.g.,* Tr. 342, 344, 360–61, 370–71). This indicates that Dr. Beale and plaintiff had an ongoing treatment relationship (even if not the most frequent relationship) during the relevant time period. Additionally, ALJ Reap expressly considered Dr. Beale to be plaintiff's treating physician (*see* Tr. 44–45, 59). Thus, I conclude that

Dr. Beale is properly considered plaintiff's treating physician.[74]

I also conclude that the ALJ's application of the treating physician rule to Dr. Beale was improper.[75] In ALJ Reap's decision following plaintiff's third administrative hearing, he stated:

[In Dr. Beale's November 2005 report, he noted] that [plaintiff] was diagnosed with a blind right eye, status post broken right wrist and lower back pain. [Plaintiff] was noted to have pain when standing or sitting for prolonged periods of time. Dr. Beale found that [plaintiff] was able to occasionally lift and carry up to twenty pounds, stand and walk for one hour and sit for three hours per day. [Plaintiff was also noted to be anxious and capable of only low stress work.] *Pursuant to 20 C.F.R. 416.927, generally, controlling weight is given to the opinion of the treating source. However, … Dr. Beale['s] [opinion] that the claimant is unable to work … is not well supported by medically acceptable clinical and laboratory techniques and it is inconsistent with the other medical and non-medical evidence in the record.* The conclusion of Dr. Beale is not supported by MRI findings, which show only mild impingement syndrome of the left shoulder and no evidence of any disc herniation or significant pathology of the lumbar spine. *In addition, Dr. Beale*

74. The Commissioner makes much of the fact that only "one form completed by Dr. Beale [is dated] during the period at issue" because plaintiff's last insured date was June 30, 2005, and further, that there are no treatment notes to support Dr. Beale's statement that he examined plaintiff about every six months since November 2002 (*see* Def.'s Mem. at 22–23). However, the mere absence of contemporaneous medical evidence of a disabling condition during the relevant time period does not necessarily preclude a finding of disability. *See Arnone v. Bowen,* 882 F.2d 34, 39 (2d Cir. 1989) ("[Plaintiff] might have satisfied his burden of demonstrating that he was continu-

ously disabled throughout [the relevant period] by means of evidence only from before and after that period."); *accord Cook v. Apfel,* 1 Fed.Appx. 13, 15–16 (2d Cir.2001); *Kelly v. Chater,* 108 F.3d 329, 1997 WL 85839 at *2 (2d Cir. Feb. 27, 1997).

75. In determining whether ALJ Reap properly applied the treating physician rule to Dr. Beale, I consider both of his decisions in plaintiff's case (*i.e.,* the decision following plaintiff's third administrative hearing, as well as the decision following the final hearing).

*only sees the claimant once every six months or less and is not an orthopedist, surgeon or neurologist, whose opinion would necessitate greater weight. Dr. Beale does not support his conclusion with any treatment notes or clinical findings. In addition, his opinion is inconsistent with his own prior report, which, indicated that [plaintiff] was only limited due to his visual impairment* [as well as inconsistent] ... with the findings of the consultative examiners. Moreover, pursuant to SSR 96–5p, issues of whether a claimant is disabled are reserved for the Commissioner and treating source opinions on that point are never entitled to controlling weight.[76]

(Tr. 59) (emphasis added). In ALJ Reap's decision following plaintiff's final administrative hearing, he stated:

The record also contains a November 2002 report prepared by [Dr. Beale], which states that plaintiff is permanently unemployable due to right eye blindness. *This [November 2002] report cannot be afforded great weight, given [plaintiff] had previously worked despite his visual impairment* [and the vocational expert identified positions at the hearing which plaintiff could perform despite his visual limitations] .... *In addition, Dr. Beale, who died on March 1, 2008 stated in a September 2005 report that the claimant had a pinched nerve in his lower back, yet the record contains no objective evidence to document [that].* Dr. Beale also opine[d] [in November 2005] that [plain-

tiff] is able to sit, stand and walk for up to 3 hours and lift and carry objects weighing up to 20 pounds, and that [plaintiff's] anxiety would cause him to miss more than 3 days of work a month, thereby precluding him from being able to hold a permanent job. *There is little objective evidence to support this [November 2005] medical assessment and [it] also cannot be afforded weight, given it was prepared 4 months after the claimant's last insured [date].* In [the] November 2005 report, Dr. Beale state[d] that he [saw] [plaintiff] once every 6 months and [he] diagnose[d] him with right eye blindness, low back pain, status post right wrist fracture and [he also] noted that results of MRI tests showed mild problems with respect to his shoulder and back.

(Tr. 44–45) (emphasis added).

The ALJ's application of the treating physician rule to Dr. Beale is problematic for two reasons. First, it is unclear whether the ALJ fully developed the record with respect to Dr. Beale. As the Commissioner points out in its motion papers (*see* Def.'s Mem. at 22–23), the treatment records do not contain Dr. Beale's notes or findings from examinations purportedly conducted between November 2002 (when Dr. Beale stated that he had first examined plaintiff) through November 2005 (when Dr. Beale completed the questionnaire indicating that he examined plaintiff about every six months). A review of the administrative record does disclose a few attempts by the SSA to obtain treatment records with respect to plaintiff;

---

**76.** The Appeals Council remanded this decision in part because: "The [ALJ] noted several opinions of temporary or permanent disability, but the decision [did] not state what weight was given to these opinions, or provide specific reasons for giving them no weight" (Tr. 66). As plaintiff's medical history includes multiple physicians over a rela-

tively long period of time, it is not clear whether this statement included the ALJ's treatment of Dr. Beale. In any event, the Appeals Council expressly instructed that the ALJ consider the various medical opinions in the record again and thereafter specify the weight given to each opinion (*see* Tr. 66).

however, these requests either did not pertain to Dr. Beale or they were not dated late enough to potentially have encompassed all of the relevant records from Dr. Beale (*see, e.g.,* Tr. 442–46, 500, 521, 569).[77] For example, the latest subpoena served upon Mount Vernon Hospital was dated May 5, 2003 (*see* Tr. 569).

The failure of the ALJ to develop the record with respect to Dr. Beale is particularly problematic because ALJ Reap specifically found that (1) portions of Dr. Beale's opinions were not supported by treatment notes (*see* Tr. 44, 59) and (2) Dr. Beale's findings were "inconsistent" with other findings that he had made previously with respect to plaintiff's condition (*see* Tr. 59). While the ALJ may have ultimately given Dr. Beale's opinions the same amount of weight, he should have (1) obtained the relevant treatment notes, or in the alternative, verified that there were no further treatment notes to obtain and (2) sought to clarify any internal consistencies that he found in Dr. Beale's opinions. While plaintiff was represented by counsel after his first administrative hearing and thereafter, this did not relieve the ALJ of his obligation to fully develop the record, *see Shaw v. Chater, supra,* 221 F.3d at 131, on this issue. *See* 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available."); *see also Perez v. Chater, supra,* 77 F.3d at 47.

The second issue concerning the ALJ's application of the treating physician rule is that he did not properly specify the amount of weight ultimately given to Dr. Beale's opinions. In his decisions, ALJ Reap stated that Dr. Beale's opinions were either (1) not "persuasive," (2) that they could not "be afforded great weight" or (3) that they could not "be afforded weight" (*see* Tr. 44–45, 58–59). Thus, it is unclear from these descriptions what weight—if any—was given to these opinions. This was error, especially in light of the potential gap in the treatment records with respect to Dr. Beale's opinions.[78] *Cf. Pierre v. Astrue,* No. 09–CV–1864 (JG), 2010 WL 92921 at *9 (E.D.N.Y. Jan. 6, 2010) (noting that the ALJ "failed . . . to mention the weight [that the treating physicians'] opinions were given (except to say it was not 'great')."); *Rodriguez v. Astrue,* 07 Civ. 534(WHP) (MHD), 2009 WL 637154 at *27 (S.D.N.Y. Mar. 9, 2009) (Pauley, D.J. adopting the Report and Recommendation of Dolinger, M.J.) (stating that the ALJ failed to specify the weight given to the treating physicians' findings, except to say that they had not been given controlling weight); *see also* SSR 96–2p, 1996 WL 374188 at *1, *4 ("Treating source medical opinions are still entitled to deference . . . . [and] [i]n many cases, [the opinion] will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *Ellington v. Astrue, supra,* 641 F.Supp.2d at 330 ("The regulations are clear that a treating physician's opinion should not be completely rejected if that opinion is found to be non-

---

**77.** Dr. Beale passed away on March 1, 2008. Because Dr. Beale did not pass away until after the relevant time period, this does not affect the analysis on this point (*see* Tr. 44).

**78.** Because I find ample reason to conclude that the ALJ failed to properly apply the treating physician rule to Dr. Beale because (1) he

did not fully develop the record with respect to Dr. Beale and (2) he did specify the weight that was ultimately given to his opinions, I do not discuss plaintiff's argument with respect to the ALJ's failure to properly apply the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6).

controlling."). On remand, the ALJ should confirm that all relevant medical records from Dr. Beale have been provided to the SSA. The ALJ should then specify the weight ultimately given to Dr. Beale's opinions—even if that weight is not controlling nor a great amount of weight.[79]

### c. Plaintiff's Credibility

Plaintiff also argues that, pursuant to 20 C.F.R. §§ 404.1529(c)(1), 404.1529(c)(3), and SSR 96–7p, the ALJ improperly evaluated his credibility with respect to his statements about the intensity, persistence and limiting effects of his pain. Specifically, plaintiff argues that the ALJ (1) "failed to state that he considered all of the factors required under 20 C.F.R. § 404.1529," (2) "did not address [plaintiff's] daily activities" and (3) "did not address precipitating and aggravating factors, such as [plaintiff's] depression, increased right leg numbness and lower back pain exacerbated by lifting or bending, and back pain caused by standing" (Pl.'s Mem. at 22). Respondent contends that (1) "the totality of the medical evidence ... does not corroborate plaintiff's subjective symptoms to the ... extent alleged" and (2) "the ALJ properly noted plaintiff's varied activities of daily living, which undermine[d] his claim ..." (Def.'s Mem. at 25–26).

 It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." *Gernavage v. Shalala*, 882 F.Supp. 1413, 1419 (S.D.N.Y.1995) (Leisure, D.J.), *accord*

*Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir.1984); *Richardson v. Astrue*, 09 Civ. 1841(SAS), 2009 WL 4793994 at *6 n. 97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.); *see Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984); *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

There is, however, an issue with the ALJ's credibility assessment.[80] In ALJ Reap's decision following plaintiff's final administrative hearing, he first stated in a conclusory manner that he "considered all [of plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96–4p and 96–7p" (*see* Tr. 42). The ALJ did not, however, expressly discuss these requirements, nor plaintiff's symptoms, in making a credibility assessment (*see* Tr. 42–45). Instead, after the ALJ considered the medical evidence in the record with respect to plaintiff's RFC, he generally concluded his analysis at step four by stating that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent [that] they [were] inconsistent with the RFC capacity assessment ...." (Tr. 45).

First, it is unclear from the face of this decision whether ALJ Reap was relying on

---

79. Because I find that remand is proper on the basis of the ALJ's failure to properly develop the record and to properly apply the treating physician rule, I do not reach plaintiff's arguments with respect to (1) the ALJ's determination of his RFC at step four and (2) whether the ALJ carried his burden at step five of the analysis. The aforementioned legal errors cause the remaining portions of the ALJ's analysis to be inherently flawed.

80. Again, I note that I consider ALJ Reap's decision following the third administrative hearing, as well as his decision following the final hearing.

his more in-depth assessment of plaintiff's credibility from his decision following plaintiff's third administrative hearing (*see* Tr. 60). However, the larger issue is that it appears from the language quoted above that ALJ Reap made a determination with respect to plaintiff's overall RFC and then used that RFC to discount plaintiff's non-conforming allegations and resulting limitations. If this is what occurred, then the ALJ's credibility assessment (and, thus, the RFC assessment) was improperly performed. *See Meadors v. Astrue*, 370 Fed. Appx. 179, 184 (2d Cir.2010) ("Because we agree that the ALJ did not properly evaluate the Appellant's testimony regarding her pain, we are unable to give his calculation of Appellant's RFC meaningful review."). On remand, the ALJ should reassess plaintiff's credibility and clearly set forth the support for his ultimate determination.

### 2. *Substantial Evidence*

Because I find legal error requiring remand, I do not reach the issue of whether the ALJ's decision was supported by substantial evidence. *See Johnson v. Bowen*, *supra*, 817 F.2d at 986; *Ellington v. Astrue*, *supra*, 641 F.Supp.2d at 328.

### IV. *Conclusion*

For all the foregoing reasons, I respectfully recommend that judgment on the pleadings be granted in favor of plaintiff and the case be remanded for further proceedings consistent with this report and recommendation.

### V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Andrew L. Carter, United States District Judge, 500 Pearl Street, Room 725, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Carter. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–238 (2d Cir.1983).